[No. 28826-1-I.    Division One.    December 13, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN ANTHONY
CONDON, *Appellant.*

*Andrew Stanton* of *Washington Appellate Defender Association,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy,* for respondent.

COLEMAN, J. — John A. Condon appeals his conviction for first degree murder, arguing that (1) the affidavit in support of the search warrant was insufficient, (2) the trial court erred in refusing to allow cross examination of a state witness regarding her possible motive for the crime, and (3) the

trial court erred in denying the defense motion for a mistrial, which was based on a witness's references to the fact that Condon had been in jail. We affirm.

Michael and Rebecca Hyde owned and operated Star Ranch, a small ranch in Snohomish County, where they trained and boarded horses. In June 1989, Michael hired Condon to work on the ranch. Condon helped Michael purchase and load hay, in addition to doing other odd jobs around the ranch.

In mid-1989, Condon moved into the Hydes' home, where he lived until late December 1989. On December 20, 1989, Michael returned home from a trip to eastern Washington and found Condon hugging Rebecca on the couch. Michael accused them of having an affair and punched Condon several times. Rebecca called 911, and Michael drove away. Michael was subsequently charged with fourth degree assault.

The next evening, Condon made dinner for Rebecca and they ended up sleeping together. After that night, Condon told Rebecca that he was in love with her. Rebecca, however, regretted the incident and for several months did not respond to further advances by Condon.

In April 1990, Rebecca needed additional stalls for boarding horses, and she temporarily rented a barn called the Gallery Stables, which had an apartment attached to it. Rebecca later moved into the apartment, in part because she and Michael were not getting along. Shortly thereafter, Condon and Rebecca resumed their affair. During this period, Condon made statements to numerous acquaintances indicating that he wanted to marry Rebecca, that he wanted Michael out of the way, and that he would kill Michael if he ever hurt Rebecca.

On Saturday, September 1, 1990, Rebecca began moving from the Gallery back to Star Ranch. That afternoon, she was in the house at Star Ranch unpacking, and Michael left to go to the store. Condon called right after Michael left, told Rebecca he had been watching the house, and asked her to meet him that evening. That night, Condon was late for their meeting, and he appeared in a hurry. Although Rebecca was

angry with him, they went over to the Gallery and spent the night together.

The next morning, Sunday, Condon woke up early and left the Gallery. Michael was supposed to come over and help Rebecca move, but he never showed up. That afternoon, after returning from horseback riding, Rebecca found a cigarette on the ground in front of the porch at Star Ranch. She picked it up and was going to smoke it, when she noticed there was blood on it. After noticing more blood on the ground, she called 911. A police officer came to the house and told her that the blood was not human and that her dog had probably killed a small animal. Later, Condon came over and helped Rebecca finish moving from the Gallery. He spent the next 2 days and nights at Star Ranch with Rebecca. At some point during that time, Condon changed the message on the answering machine from Michael's voice to his own.

On September 4, 1990, Michael's mother called the Snohomish County Sheriff's office to report that her son was missing. Officers came over to Star Ranch, and Rebecca showed them the area where she had found the blood and bone fragments. They discovered a shotgun casing on the ground nearby. Behind the house, Officer Russell Quay detected the odor of decaying flesh and discovered Michael's body underneath a wheelbarrow. The body had shotgun wounds to the head and chest.

On September 6, 1990, police obtained a warrant to search Condon's residence. Officers found a shotgun and a number of 12-gauge shotgun shells. A laboratory analysis showed that the shotgun had fired the casing found at the crime scene. In addition, in Condon's wallet police found a business card for Star Ranch, which was printed with the names of Michael and Rebecca Hyde. These names had been crossed out and replaced with "John and Rebecca Condon". Condon was arrested and charged with first degree murder. A jury found him guilty as charged, and Condon appeals.

Condon first contends that the affidavit in support of the search warrant was insufficient.

■■ An affidavit in support of a search warrant establishes sufficient probable cause if it " '[sets] forth facts sufficient for a reasonable person to conclude the defendant probably is involved in criminal activity.' " *State v. Maxwell*, 114 Wn.2d 761, 769, 791 P.2d 223 (1990) (quoting *State v. Huft*, 106 Wn.2d 206, 209, 720 P.2d 838 (1986)). In determining whether probable cause exists, a magistrate is entitled to draw reasonable inferences from the facts and circumstances set forth in the affidavit. *State v. Helmka*, 86 Wn.2d 91, 93, 542 P.2d 115 (1975) (citing *Irby v. United States*, 314 F.2d 251 (D.C. Cir.), *cert. denied*, 374 U.S. 842 (1963); *State v. Peterson*, 3 Wn. App. 946, 947, 478 P.2d 745 (1970)).

■■ A magistrate's determination of probable cause will not be reversed absent an abuse of discretion. *State v. Estorga*, 60 Wn. App. 298, 303, 803 P.2d 813 (citing *State v. Smith*, 93 Wn.2d 329, 610 P.2d 869, *cert. denied*, 449 U.S. 873 (1980)), *review denied*, 116 Wn.2d 1027 (1991). In reviewing a determination of probable cause, a court may consider only the information available to the magistrate at the time the warrant was issued. *Estorga*, at 304 (citing *State v. Patterson*, 83 Wn.2d 49, 55, 515 P.2d 496 (1973)).

The affidavit in the present case was based primarily on Rebecca's statement to the police. It stated that there had been ongoing, sometimes physical, conflicts between Michael, Condon, and Rebecca and that Condon was upset the day Rebecca moved back to Star Ranch. It also stated that Condon had been watching Star Ranch when Rebecca began moving her possessions back to the house, that Condon helped Rebecca move, and that he stayed at the ranch for several days, despite the fact that he was usually fearful of confronting Michael. In addition, Rebecca's statement, which was attached to the affidavit, stated that Condon told her she would have to say they were together Saturday night.

Condon argues that the affidavit failed to establish that he probably murdered Michael Hyde. He argues that all the activities alleged in the affidavit were innocent and that nothing in the affidavit showed that his behavior that weekend was unusual. He claims that "[t]here simply was not

enough information provided to the magistrate about Condon's behavior that would lead a reasonable person to conclude that Condon probably murdered Michael Hyde." Brief of Appellant, at 22.

To support his claim, Condon cites *State v. Anderson*, 37 Wn. App. 157, 678 P.2d 1310 (1984). In that case, the defendant was charged with second degree burglary after officers searched his house and found items that had been stolen from a nearby service station. *Anderson*, at 158. The affidavit supporting the search warrant alleged:

> (1) that the residents of the searched premises were customers of the service station and smoked cigarettes of the type stolen in the burglary; and (2) that the police officer observed "2 full cases of soda pop such as had been stolen from the . . . service station" in an outward-facing refrigerator located outside by one of the outbuildings on the south side of the residence.

*Anderson*, at 161. The court held that these facts were insufficient to establish probable cause, reasoning that if the affidavit was deemed sufficient, any customer of the store with these goods in his or her possession would be subject to search. *Anderson*, at 161.

Unlike the affidavit in *Anderson*, the affidavit in the present case established a strong likelihood that Condon, and no one else, committed the crime. These facts described Condon's affection for Rebecca, his open presence at the ranch, which, despite Condon's assertions to the contrary, was unusual, and his attempts to establish an alibi. From these facts, the magistrate could reasonably infer that Condon had a strong motive for the crime and that his behavior demonstrated guilty knowledge. Thus, the magistrate reasonably concluded that Condon probably committed the crime. *See also Cupp v. Murphy*, 412 U.S. 291, 293, 36 L. Ed. 2d 900, 93 S. Ct. 2000 (1973) (probable cause found where defendant had stormy marriage with murder victim, lack of struggle at murder scene indicated killer was known to victim, defendant was at victim's home the night of the murder, and defendant showed no concern about victim's fate); *State v. Higginbotham*, 162 Wis. 2d 978, 471 N.W.2d 24 (1991) (in arson

case, probable cause existed to search victim's ex-girlfriend's house where victim had reported ex-girlfriend's activities to welfare authorities and ex-girlfriend was seen driving very slowly past victim's house shortly after the fire).

Condon further argues that the affidavit did not contain sufficient facts establishing that the items described in the warrant would be found at Condon's residence, as opposed to somewhere else. To support this contention, he cites *State v. Rangitsch*, 40 Wn. App. 771, 772, 700 P.2d 382 (1985), in which the defendant was convicted of five counts of negligent homicide, for deaths which occurred as a result of driving under the influence of cocaine, and one count of possession of a controlled substance. The Court of Appeals reversed the conviction for possession of a controlled substance, concluding that the affidavit in support of the search warrant was insufficient because it was based solely on an officer's belief that habitual drug users keep narcotics in their homes. *Rangitsch*, at 780.

As the State points out, however, many jurisdictions hold that when the object of a search is a weapon used to commit a crime, it is reasonable to infer that the weapon is located at the perpetrator's residence, especially in cases where the perpetrator is unaware that police have connected him or her to the crime. *See, e.g., State v. Couture*, 194 Conn. 530, 545, 482 A.2d 300, 309 (1984), *cert. denied*, 469 U.S. 1192 (1985); *State v. Faragi*, 127 N.H. 1, 7, 498 A.2d 723, 727 (1985) (citing 1 W. LaFave, *Search and Seizure* § 3.7, at 709 (1978)). Thus, because it is reasonable to infer that the weapon used to commit a crime may be found at the perpetrator's residence, the fact that the affidavit did not specify why items should be found in Condon's residence, as opposed to anywhere else, does not render it insufficient.[1]

---

[1] In his pro se brief, Condon argues that evidence of the shotgun was improperly admitted because it lacked relevance. Condon is correct that the testimony failed to establish a connection between the shots that killed Michael and the shotgun found at Condon's residence. The State's firearms and ballistics expert testified that because the shotgun slug that caused a fatal wound to Michael's head was so badly deformed, it was not possible to determine the type of shotgun

The next issue Condon raises is whether the trial court erred in refusing to allow cross examination of a state witness regarding her possible motive for the crime.

The right to cross-examine adverse witnesses is guaranteed by the confrontation clauses of the Washington and United States Constitutions. *State v. Hudlow*, 99 Wn.2d 1, 15-16, 659 P.2d 514 (1983). A defendant has the right to cross-examine a witness regarding matters affecting the witness's credibility. *State v. York*, 28 Wn. App. 33, 36, 621 P.2d 784 (1980).

At trial, Condon sought to introduce evidence of Michael's abuse of Rebecca and statements Rebecca had made to witnesses about divorce and property settlements. He wished to use this evidence to show that Rebecca had a motive to kill her husband, thereby impeaching her credibility and showing possible bias. The trial court refused to allow cross examination in these areas because there was insufficient evidence to implicate Rebecca as a suspect.

To support his contention that he should have been allowed to cross-examine Rebecca regarding her relationship with Michael, Condon cites *Davis v. Alaska*, 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105 (1974). In *Davis*, the defendant was convicted of burglary and grand larceny for stealing a safe from a bar. One of the State's primary witnesses was a juvenile who previously had been convicted of burglary and was on probation. The safe had been found near the juvenile's residence. The trial court granted the State's motion for a protective order, prohibiting any cross examination of the juvenile regarding his burglary conviction and probation status. *Davis*, 415 U.S. at 309-11.

At trial, the juvenile testified that he had seen the defendant, holding "something like a crowbar", standing on the

---

that fired the slug. In addition, the other wounds on Michael's body could not be conclusively linked to the shotgun found at Condon's residence.

However, the shell casing found at the scene matched the shotgun. The trial court found that this was a sufficient nexus between the homicide and the shotgun and that questions raised regarding its relevance were a matter of weight, rather than admissibility. We agree that this was a sufficient nexus and therefore conclude that the trial court did not abuse its discretion in admitting the shotgun.

road near his house. *Davis*, 415 U.S. at 310. During cross examination, defense counsel asked the juvenile if he was nervous about the fact that a stolen safe had been discovered near the house where he lived. The juvenile answered "no". Defense counsel also asked if police had interrogated him regarding the safe, and the juvenile replied that they had. When asked if he had ever been interrogated like that before, the juvenile said "no". *Davis*, 415 U.S. at 313.

On appeal, the defendant argued that he should have been able to raise the witness's own criminal history and probation status during cross examination, in order to show the existence of possible bias and prejudice. *Davis*, 415 U.S. at 317. The United States Supreme Court agreed, stating:

> Since defense counsel was prohibited from making inquiry as to the witness'[s] being on probation . . ., [the witness's] protestations of unconcern over possible police suspicion that he might have had a part in the . . . burglary and his categorical denial of ever having been the subject of any similar law-enforcement interrogation went unchallenged.

*Davis*, 415 U.S. at 313-14. Because the Court believed that cross examination on these matters could have affected the jury's assessment of the witness's credibility, the conviction was reversed.

Condon argues that, like the defendant in *Davis*, he was denied his right to cross examination. He argues that Michael's abuse and Rebecca's "unhappiness with a proposed property settlement would have provided compelling evidence of actual bias because it would have established a clear motive for Rebecca Hyde to murder her abusive husband." Brief of Appellant, at 28. Condon, however, misinterprets *Davis*. *Davis* does not stand for the proposition that evidence showing a third person's motive to commit the crime can be introduced for purposes of showing that person's bias. In *Davis*, the defense did not want to show that the witness committed the crime, only that the witness's own fears of implication caused him to make a hasty, and therefore unreliable, identification of the defendant. *Davis*, 415 U.S. at 317. Moreover, unlike the witness in *Davis*, Rebecca was not on probation and there was

nothing to potentially connect her to the crime, thereby providing a motive to testify untruthfully. Thus, *Davis* is distinguishable.

■ The general rule is that a defendant cannot introduce evidence that a third party committed the crime for which the defendant is on trial unless there is a sufficient nexus between the third party and the crime. The State is correct that evidence of a possible motive to commit the crime is not sufficient to establish this nexus. *State v. Mak*, 105 Wn.2d 692, 717, 718 P.2d 407 ("[I]f evidence of motive alone upon the part of other persons were admissible . . . in a case involving the killing of a man who had led an active and aggressive life[,] it might easily be possible for the defendant to produce evidence . . . that hundreds of other persons had some motive or *animus* against the deceased[.]") (quoting *State v. Kwan*, 174 Wash. 528, 533, 25 P.2d 104 (1933)), *cert. denied*, 479 U.S. 995 (1986). Thus, because the impeachment value of the testimony depended on the inference that Rebecca killed her husband, Condon was not entitled to use this evidence to impeach her. The trial court properly prohibited cross examination in these areas.

Finally, Condon contends that the trial court erred in denying his motion for a mistrial based on a witness's references to the fact that Condon had been in jail.

■ ■ An irregularity in trial proceedings is grounds for reversal when it is so prejudicial that it deprives the defendant of a fair trial. *See State v. Post*, 59 Wn. App. 389, 395, 797 P.2d 1160 (1990), *aff'd*, 118 Wn.2d 596, 826 P.2d 172, 837 P.2d 599 (1992). In determining whether a trial irregularity deprived a defendant of a fair trial, the reviewing court should examine the following factors:

> (1) the seriousness of the irregularity, (2) whether the statement in question was cumulative of other evidence properly admitted, and (3) whether the irregularity could be cured by an instruction to disregard the remark, an instruction which a jury is presumed to follow.

*State v. Escalona*, 49 Wn. App. 251, 254, 742 P.2d 190 (1987) (citing *State v. Weber*, 99 Wn.2d 158, 164-65, 659 P.2d 1102 (1983)).

In the present case, the trial court granted the defense motion to exclude any reference to the fact that Condon had spent time in jail. Later, in answering a question during direct examination, Rebecca testified that Condon had called her "when he was getting out of jail". Defense counsel objected, the remark was stricken, and the jury was instructed to disregard the comment. A few minutes later, Rebecca stated that Condon had asked her to pick him up from jail in Seattle. The trial court excused the jury and explained to Rebecca that she was not supposed to mention that Condon had been in jail. The court denied defense counsel's motion for a mistrial and gave the following cautionary instruction to the jury when it returned to the courtroom:

> Two references have been made by this witness to the defendant having been in jail. You . . . are to completely disregard such references and the references should not be considered by you in any way in your deliberations upon this case.

Later, during cross examination, the following exchange took place:

Q: And before you brought [Condon] to the Gallery, you told Maria that you were going to pick him up.
A: Um-hmm.
Q: That you had a friend that you were going to pick up and bring him back to the Gallery; is that right?
A: Yeah. I didn't tell her where I was picking him up. *I'm not allowed to say that, but he was in a desperate situation that night*[.]

(Italics ours.)

Condon claims that *Escalona* supports his argument that Rebecca's reference to jail was grounds for a mistrial. In *Escalona*, the defendant was convicted of second degree assault with a deadly weapon. The trial court granted the defendant's motion to exclude reference to the fact that the defendant previously had been convicted of the same crime. *Escalona*, at 252. During cross examination, the victim stated that on the day of the stabbing, he was nervous when he saw the defendant because the defendant already had a record and had stabbed someone. Defense counsel moved for a mistrial, but

the trial court denied the motion and instructed the jury to disregard the remark. *Escalona*, at 253.

The Court of Appeals reversed the conviction, reasoning that (1) the irregularity was extremely serious, (2) it was not cumulative, since the trial court had already ruled that evidence of the prior crime could not be admitted, and (3) the trial court's instruction to the jury could not have cured the prejudice caused by the remark. *Escalona*, at 255. Regarding the prejudice caused by the remark, the court stated:

> [D]espite the court's admonition, it would be extremely difficult, if not impossible, in this close case for the jury to ignore this seemingly relevant fact. Furthermore, the jury undoubtedly would use it for its most improper purpose, that is, to conclude that Escalona acted on this occasion in conformity with the assaultive character he demonstrated in the past.

*Escalona*, at 256. Thus, the court concluded that the trial court abused its discretion in denying the defense motion for a mistrial. *Escalona*, at 256; *see also State v. Wilburn*, 51 Wn. App. 827, 832, 755 P.2d 842 (1988) (Alexander, J., dissenting) (rape conviction reversed when, in violation of motion in limine, witness testified that defendant told her, " '*Yes, I did it again, and I need treatment.*' ").

█ *Escalona* and *Wilburn* are distinguishable from the present case. In both cases, the improper statements indicated that the defendants had committed crimes similar or identical to the crimes for which they were on trial. Thus, the statements were extremely prejudicial because it was likely that jurors would conclude that the defendant had a propensity for committing that type of crime.

In the present case, on the other hand, the reference to Condon having been in jail was much more ambiguous. The mere fact that someone has been in jail does not indicate a propensity to commit murder, and the jury just as easily could have concluded that Condon was in jail for a minor offense. Also, the fact that someone has been in jail does not necessarily mean that he or she has been convicted of a crime. Thus, although the remarks may have had the poten-

tial for prejudice, they were not so serious as to warrant a mistrial, and the court's instructions to disregard the statements were sufficient to alleviate any prejudice that may have resulted.[2]

The judgment and sentence of the trial court are affirmed.

PEKELIS, A.C.J., and SCHOLFIELD, J., concur.

Reconsideration denied January 21, 1994.

Review denied at 123 Wn.2d 1031 (1994).

---

[2]Furthermore, unlike *Escalona*, this was not a "close case". The evidence against Condon, which included statements made to fellow inmates in which he confessed the crime, was very strong.