# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68971-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| KELSEY MARIE JOHNSON, | ) | |
| Defendant, | ) | |
| and | ) | |
| KEITH THOMAS BLAIR, | ) | |
| Appellant. | ) | FILED: March 10, 2014 |

GROSSE, J. — When, as here, the State's witness made a single vague reference to another investigation in violation of the court's order in limine to exclude evidence of other crimes, and the defendant fails to show that there was a substantial likelihood that this testimony affected the verdict in light of ample other evidence of guilt, the trial court did not abuse its discretion by denying a motion for a mistrial. Accordingly, we affirm.

## FACTS

The State charged Keith Blair with several counts of residential burglary involving multiple victims, one count of attempted residential burglary, two counts of theft of a firearm, and one count of taking a motor vehicle. The charges arose out of a series of burglaries that occurred in Seattle and surrounding areas in King County between July and October of 2010.

On July 25, 2010, the home of Joseph Saldin was burglarized and his car, a silver Porsche, was stolen. Also stolen were a safe, jewelry, shotgun, cigars, and watches. A neighbor saw someone with a limp walk up a hill in the neighborhood and then drive down the hill in the silver Porsche a short time later. The Porsche was later found crashed and abandoned.

On August 6, 2010, the home of Pamela LaCount was burglarized. A safe containing $30,000 was stolen, along with jewelry, an Xbox system, a laptop computer, walkie talkies, a Rolex watch, and a shotgun. On August 31, 2010, the home of Patrick Paveglio was burglarized. Tools and a lawn mower were stolen.

On September 14, 2010, the home of Tammy Bodmer was burglarized. A bike was stolen, along with five laptop computers, jewelry, watches, silver coins, and an external hard drive. On September 15, 2010, the home of Jeffrey Chrisope was burglarized. Keys, horse-themed jewelry, motorcycle riding gear, a large television, global positioning system units, an Xbox system, computer hardware and software, and a red car was stolen. Chrisope found his wife's red car several days later, not far from the house. On that same day, the home of Tony Marti was burglarized. Marti's bedroom windows were broken and a kitchen window was removed.

On September 18, 2010, the home of Angela Parvanta was burglarized. Jewelry boxes, jewelry, watches, three computers, and four martial arts swords were stolen. Parvanta found a ladder propped up against the house leading to a balcony. On September 23, 2010, the home of Robinson Walden was

burglarized. Jewelry, watches, a laptop computer, headphones, and speakers were stolen.

On September 26, 2010, there was an attempted burglary at the home of Elizabeth Dolliver and Philip Thompson. Dolliver came home and found a man with a light gray jacket and a backpack descending a ladder that was propped up against her house. When she confronted him, he fled. Thompson chased him on foot. A neighbor, Travis Testerman, saw a man walking briskly near the Dolliver residence with a backpack. He saw the man cut through a neighbor's yard, emerge without the backpack, and get picked up by someone driving a black sedan. Testerman, who was an off duty Seattle police officer, followed the car and gave the 911 operator a partial license plate number. Testerman then went back and found the discarded backpack, which was later found to contain a gray jacket, gloves, and small crowbar. Testerman identified Blair from a photomontage.

On September 27, 2010, the home of Gary Rollins and Patrick Murray was burglarized. Items stolen included a pistol, a laptop computer, dehydrated camping food, a suitcase, a backpack, a coin collection, watches, and jewelry. Rollins found his ladder leaning up against his bedroom window and the screen had been cut out. A neighbor saw a suspicious person on the side of the home around midnight, talking on a cellular phone, and limping toward the street with a backpack. A black four door car drove up and the man said, "Turn off the lights." The lights then turned off and the man loaded a backpack and suitcase into the car.

King County Detectives Matthew Volpe and Cary Coblantz investigated the burglaries. Volpe sought to recover some gold that was stolen in the burglaries by contacting Ryan Youngberg, a person who advertised on Craigslist as a buyer of gold. Youngberg set up a meeting with Volpe and Kelsey Johnson, who was Blair's girlfriend.

On September 28, 2010, Volpe met with Johnson, who arrived in a black Kia. Volpe identified himself as a detective and asked to speak with her. After Johnson provided information to Volpe about the burglaries, Volpe seized the Kia and obtained a search warrant to look for stolen property inside the car. The license plate number on the car closely resembled the partial one which was reported from the car seen at the Dolliver burglary. The car had been rented by Aaron Knapp, a friend of Blair.

On October 4, 2010, Volpe searched the car and found various items stolen during the burglaries of the homes of Rollins, Parvanta, and Chrisope. He also found paperwork from the Employment Security Department with Blair's name on it, a receipt from a clothing store with Blair's name on it, and a receipt for a Travelodge motel room rented to Aaron Knapp.

On October 11, 2010, the home of James and Mary Lee was burglarized. Passports, credit cards, social security cards, and other documents were taken from a safe. Cameras, laptop computers, jewelry, and a data projector were also stolen. Lee found an open can of Dr. Pepper soda on a dresser and a tool that did not belong to her family on the floor next to the safe. DNA (deoxyribonucleic acid) recovered from the soda can matched Blair's DNA profile.

On October 21, 2010, based on information he received from a Snohomish County detective, Volpe went to an Everett motel where he hoped to contact Johnson and Blair. Johnson and Blair arrived at the motel in a Mercedes that belonged to Johnson. Volpe obtained a search warrant for the Mercedes and searched the car. He found coins, dehydrated food, jewelry, and other items stolen in the burglaries. He also found a receipt for payment on a storage unit in Lynnwood. Volpe arrested Blair and Johnson.

On November 2 or 3, 2010, Volpe investigated the Lynnwood storage unit but found it mostly empty except for a boat motor, a black bag, and some speakers. Volpe was then contacted by Johnson, who offered to disclose what she knew about the burglaries. Johnson told him she had been to the Lynnwood storage unit with Blair and had seen much of the stolen property in that unit. She also told him that the property had been moved to a different storage unit in Monroe, which had been rented by Blair's wife Rachel Dunham. Volpe's investigation corroborated this information. On November 5, Volpe obtained a search warrant for the Monroe unit and after searching its contents, found a large quantity of stolen property.

Johnson continued to contact Volpe and provide information about the burglaries. She also showed Volpe and Coblantz the houses that Blair burglarized and gave them specific information about the crimes that corroborated the victims' reports. Johnson agreed to testify against Blair and plead guilty to two counts of second degree possession of stolen property in exchange for the State's dismissal of the counts of first degree trafficking in

stolen property and first degree possession of stolen property with which she was originally charged.

The State proceeded to trial on Blair's case on several counts of residential burglary, two counts of theft of a firearm, and one count of taking a motor vehicle. An additional count of money laundering was severed and prosecuted in a separate trial. The trial court ruled in limine to exclude evidence relating to other criminal activity for which Blair was being investigated or charged. Blair also moved to suppress evidence of calls he made from the jail to his wife about the stolen property. In these calls, he asked her where the property was being kept and to sell it. The trial court denied the motion.

At trial, Youngberg testified that he bought gold from Blair "[b]efore this whole thing happened when [he] was called into questioning," and that he was first contacted about Blair by the Bellevue Police Department. Blair moved for a mistrial, arguing that this testimony violated the motion in limine. The trial court denied the motion.

Johnson testified that she met Blair in August 2010. Blair was driving a silver Porsche, which she heard was stolen and was later crashed by his friend and abandoned. Johnson testified that Blair had an injured foot and sometimes walked with a limp. She said he had paid off her traffic tickets and paid to help her regain possession of her car. As a result and because she liked him, she felt "obligated" to help Blair by driving him to and from the houses he burglarized. She then testified about each of the burglaries with which Blair was charged.

The jury acquitted Blair of one count of theft of a firearm and found him guilty of the lesser included offense of first degree criminal trespass on one of the counts of residential burglary. The jury found him guilty as charged on the remaining counts. The trial court imposed an exceptional sentence of 186 months based on the "free crimes" aggravator. Blair appeals.

ANALYSIS

1. Motion for Mistrial

Blair moved in limine to exclude evidence of other crimes that had been prosecuted in a different King County case or that were pending in Snohomish County. The State responded that it was not seeking to admit any ER 404(b) evidence but did note that it would be calling Youngberg, who was also a witness in the prior King County case. As the prosecutor explained:

> The only thing that -- as I'm hearing counsel talk about -- is one of the witnesses the State does intend to call is Ryan Youngberg, who is somebody that posted on Craigslist -- excuse me, he bought some gold from Kelsey Johnson. And the only reason --

Defense counsel then interrupted and stated, "They can introduce that. That's not part of this other case." The prosecutor continued, stating:

> I know that he was also a witness in that case. And so there might be some cross-over in that sense, but I will not be talking about any specifics at all about any of the other burglaries either pending in Snohomish County or already charged here. I'm only limiting the defendant to these counts.

The trial court granted the motion.

At trial, Youngberg testified that he bought gold and advertised on Craiglist. He testified that he "ran into a situation" that made him realize he needed to be checking identifications (IDs) and writing receipts when dealing with

sellers. When the prosecutor asked what that situation was, he responded, "It was when the Keith Blair incident happened. I don't know the exact date." The prosecutor then asked when he learned he needed to take these precautions and engaged in the following exchange occured:

> A.     Oh, from the time that I brought in -- was brought in for questioning, I learned from there on I needed to be taking IDs and writing receipts.
> Q.     Did you buy gold from Keith Blair then?
> A.     Before, yes. Before this whole thing happened when I was called in for questioning, yes, I did.

Youngberg then identified Blair in court and the prosecutor continued:

> Q.     So when you talk about that you were questioned, is that when you came in contact with Detective Volpe from the King County Sheriff's Office?
> A.     It was the Bellevue Police Department was the first time that I was contacted.
> Q.     All right. I want to focus on Detective Volpe --
> A.     On who?
> Q.     Detective Volpe.

Defense counsel then called for a sidebar.

Blair moved for a mistrial, arguing that Youngberg's testimony violated the court's ruling in limine. Blair asserted that when Youngberg testified about an investigation by the Bellevue Police Department involving buying gold from Blair, he was referring to the other King County case that was already tried and subject to the court's ruling in limine. Youngberg testified at that trial, which was a trafficking charge involving Blair's illegal sale of gold to Youngberg.

The trial court denied the mistrial motion, stating:

> It is -- I don't think there is any question. It is prejudicial. The only question is whether it is so prejudicial that the defendant won't be able to have a fair trial with these particular jurors.
>     It is just one question. Admittedly it wasn't blurted out by the

8

witness. It was actually asked by the prosecutor. That's a whole other issue.

There is no curative instruction. I agree. I don't think there is a curative instruction that we can give without calling attention to the whole issue. The real question is how serious it is. I guess I'm debating that.

On the one hand, I think it is egregious because it is in violation of the motion in limine and talks about another case. I don't think the jurors are going to be fooled for one minute thinking it was a legitimate business deal, the defendant selling gold to Mr. Youngberg.

On the other hand, as the State has pointed out, there is, apparently, some jail tapes where the defendant is talking to his wife about gold and telling his wife to sell gold. And the defendant's girlfriend, who he has been living with, is selling gold to Mr. Youngberg.

So I don't know if it is really that much of a leap for the jurors to believe that the defendant was involved in selling gold. I'm not sure that they are savvy enough to figure out which police department -- which police officers worked at King County, Bellevue, Seattle, whatever.

I'm going to deny the motion for mistrial, somewhat reluctantly.

Blair contends that a mistrial was warranted because the violation of the motion in limine amounted to prosecutorial misconduct and was also a serious trial irregularity. We disagree. A trial court will a grant a mistrial "'only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly.'"[1] Because the trial judge is in the best position to determine the impact of a potentially prejudicial remark, we review a trial court's decision to grant or deny a mistrial for an abuse of discretion.[2]

To prevail on a claim of prosecutorial misconduct, the defendant must show "'that the prosecutor's conduct was both improper and prejudicial in the

---

[1] State v. Rodriguez, 146 Wn.2d 260, 270, 45 P.3d 541 (2002) (quoting State v. Kwan Fai Mak, 105 Wn.2d 692, 701, 718 P.2d 407 (1986)).
[2] State v. Escalona, 49 Wn. App. 251, 254-55, 742 P.2d 190 (1987).

context of the entire record and the circumstances at trial.'"[3]  Prosecutorial misconduct is prejudicial when there is a substantial likelihood that the misconduct affected the jury's verdict.[4]  The State does not appear to contend that the prosecutor's conduct was proper, as the briefing focuses only on the prejudice prong of the analysis.  Indeed, as the trial court concluded, by eliciting testimony that referred to charges that were within the scope of the court's order in limine, the prosecutor's conduct was improper.  But viewed in context of the entire record, Blair fails to show that this testimony was so prejudicial that there was a substantial likelihood it affected the jury's verdict.

First, while a reasonable inference from this testimony is that Blair was involved in selling stolen gold, the testimony itself was vague and did not specifically refer to the other charges.  Youngberg's reference to the Bellevue Police Department was preceded by his reference to "the Keith Blair incident," which everyone understood was the charged conduct in this case.  Thus, the jurors could have reasonably inferred that he was talking about the current charges.  Additionally, as the State points out, the charged crimes occurred in several different municipalities throughout King County, including Seattle, Shoreline, Lake Forest Park, Medina, Kirkland, Bothell, and Kenmore, and the detectives testified about contracts the King County Sheriff's Office had with some of the municipalities to provide law enforcement services.  Thus, as the trial court concluded, the jury could have reasonably inferred that there were

---

[3] State v. Thorgerson, 172 Wn.2d 438, 442-43, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)).
[4] Thorgerson, 172 Wn.2d at 442-43.

connections between the different law enforcement agencies and that the investigation by the Bellevue Police Department was part of the current case.

Additionally, unlike the cases cited by Blair where the admission of prior bad acts may have led jurors to convict based on propensity given the lack of other credible evidence,[5] here, it is unlikely that this single vague reference to a Bellevue investigation would affect the verdict, given the additional ample evidence of guilt. The State's case was based on eyewitness testimony. Johnson gave details that were corroborated by the victims and other witnesses, witnesses identified Blair and the vehicles he used, and victims identified stolen property that was found in those vehicles. Stolen property was also found in the motel room Blair occupied and in the storage unit his wife rented; Blair's DNA was found at one scene, and Blair called his wife from jail about the stolen property. Blair fails to establish that the prosecutor's conduct was so prejudicial to warrant reversal.

Nor can he establish that Youngberg's testimony amounts to a serious trial irregularity requiring a mistrial. "An irregularity in trial proceedings is grounds for reversal when it is so prejudicial that it deprives the defendant of a fair trial."[6] To determine whether a trial irregularity deprived a defendant of a fair trial, a reviewing court considers the following factors: "(1) the seriousness of the irregularity, (2) whether the statement in question was cumulative of other evidence properly admitted, and (3) whether the irregularity could be cured by an instruction to disregard the remark, an instruction which a jury is presumed to

---

[5] See Escalona, 49 Wn. App. at 254-55.
[6] State v. Condon, 72 Wn. App. 638, 647, 865 P.2d 521 (1993).

follow."[7]  We review claims of prejudice "against the backdrop of all the evidence."[8]

While a violation of an order in limine is considered a serious trial irregularity, not all violations of orders in limine have been held to be so serious as to deprive the defendant of a fair trial.[9]  In <u>Condon</u>, the State's witness twice testified that the defendant had been in jail despite an order in limine excluding such evidence, but the court held that while the remarks had the potential for prejudice, they were not so serious to warrant a mistrial.[10]  The court noted that the reference to being in jail was ambiguous and did not necessarily indicate a propensity to commit the crime charged, nor did it necessarily mean that the defendant had been convicted of a crime.[11]  The court also noted that the curative instruction alleviated any resulting prejudice, and that unlike in <u>Escalona</u>, it was not a "close case," as the evidence against Condon was strong.[12]

Viewed in context and against the backdrop of all the evidence, Youngberg's remark was likewise not so serious as to deprive Blair of a fair trial. While no curative instruction was given (although it was offered), as discussed above, the remark was sufficiently vague about which incident he was describing. At most, the jury could infer he was involved in selling stolen gold, but this was not the crime with which he was charged in this case.  Thus, as in <u>Condon</u>, the

---

[7] <u>Escalona</u>, 49 Wn. App. at 254.
[8] <u>Escalona</u>, 49 Wn. App. at 254.
[9] <u>See</u> <u>State v. Thompson</u>, 90 Wn. App. 41, 46-47, 950 P.2d 977 (1998) (remark "was sufficiently serious because it violated a motion in limine," but "not so egregious as to deny . . . a fair trial"); <u>Condon</u>, 72 Wn. App. at 649-50.
[10] 72 Wn. App. 638, 648-50, 865 P.2d 521 (1994).
[11] <u>Condon</u>, 72 Wn. App. at 649.
[12] <u>Condon</u>, 72 Wn. App. at 650, n.2.

improper remark was ambiguous enough that it did not necessarily suggest a propensity to commit the crime charged. Additionally, as discussed above, this was not a "close case," as in Escalona, given the additional amount of credible evidence of guilt.

Blair's reliance on State v. Trickler[13] is misplaced. That case did not involve a motion for a mistrial or a violation of an order in limine to exclude prejudicial evidence. Rather, this was a reversal of the trial court's ruling admitting evidence of other pieces of stolen property in the defendant's possession when the defendant was only charged with possession of a stolen credit card. Unable to discern whether the trial court balanced the probative value against its prejudicial impact, the court held that the evidence was more prejudicial than probative because it allowed the jury to consider evidence of the defendant's possession of "a plethora of other allegedly stolen items" as the State's proof that he must have also known the credit card was stolen and was therefore impermissible propensity evidence.[14] But unlike in Trickler, where the trial court failed to consider the obvious prejudicial impact of evidence that the defendant possessed several stolen items for which he was not charged, here, the trial court considered the prejudicial effect of an isolated vague reference to Blair's involvement in other possible criminal activity that was not the same crime with which he was charged in the current case. As discussed above, the trial court did not abuse its discretion in determining that it was not so prejudicial as to deprive Blair of a fair trial.

---

[13] 106 Wn. App. 727, 25 P.3d 445 (2001).
[14] Trickler, 106 Wn. App. at 734.

2. Validity of Search Warrant

Blair challenges the validity of the search warrant for the Monroe storage unit, contending that the affidavit in support of the search warrant did not establish "timely probable cause" to search the unit. Blair asserts that the information that contraband would be found in the place to be searched was stale because his wife rented the Monroe unit on September 13, 2010, but the warrant for it was not presented and executed until November 5, 2010. We disagree.

Probable cause for a search warrant must be timely.[15] "The facts set forth in the affidavit must support the conclusion that the evidence is probably at the premises to be searched at the time the warrant is issued."[16] A reviewing court evaluates an affidavit "in a commonsense manner, rather than hypertechnically, and any doubts are resolved in favor of the warrant."[17] Our courts have recognized that "some time passes between the officer's or informant's observations of criminal activity and the presentation of the affidavit to the magistrate," but "[t]he magistrate must decide whether the passage of time is so prolonged that it is no longer probable that a search will reveal criminal activity or evidence, i.e., that the information is stale."[18]

Factors to consider in assessing staleness include "the time between the known criminal activity and the nature and scope of the suspected activity."[19] Two separate statements of time have been found to be important in determining

---

[15] State v. Lyons, 174 Wn.2d 354, 357, 275 P.3d 314 (2012).
[16] Lyons, 174 Wn.2d at 360.
[17] State v. Jackson, 150 Wn.2d 251, 265, 76 P.3d 217 (2003).
[18] Lyons, 174 Wn.2d at 360-61.
[19] Lyons, 174 Wn.2d at 361.

14

staleness: "(1) when the affiant received the tip and (2) when the informant observed the criminal activity."[20] A magistrate cannot determine whether observations recited in the affidavit are stale unless the magistrate knows the date of those observations.[21] But "[a]n affidavit lacking the timing of the necessary observations might still be sufficient if the magistrate can infer recency from other facts and circumstances in the affidavit."[22]

Here, the affidavit for the search warrant for the Monroe storage unit states in relevant part:

> On 11/3/10 at 2020 hrs Det. Grose and I went to the King County Jail and arranged to have Johnson brought to an interview room. . . . I asked her where the property was from the burglaries. She told me that she last saw it at a storage unit in Lynnwood that was registered in the name of Blair's brother's girlfriend, a name she didn't know. She said that she last saw some valuable swords and the rest of the coins that were stolen in the Shoreline burglary. She said that there was a lot of property filling the unit in luggage that she knew to be stolen. She confirmed that she saw a boat motor in the unit. She thought Blair had the only key for the unit, but said that he told Rachel Dunham to move the property after he got arrested. She said that she heard Blair arguing with his wife on one occasion because she had moved his property out of the storage unit into another unit in Monroe. Johnson said that Dunham was upset that Blair was with Johnson. Dunham told Blair that she would tell him where the unit was if he came home to her. Johnson said that Blair did not know where this storage unit was, but only knew it was a small private business in Monroe. Johnson was confident that all the property stolen in the burglaries was moved from the Lynnwood unit to the unit in Monroe. She confirmed that Dunham was very aware of all the crimes that Blair was committing and that she had a methamphetamine habit so she needed money to support it. Johnson agreed to show me the storage unit in Lynnwood.
> . . . .
> We all looked into the unit from the top and confirmed it was just as

---

[20] Lyons, 174 Wn.2d at 361.
[21] Lyons, 174 Wn.2d at 361.
[22] Lyons, 174 Wn.2d at 361-62.

I saw it the previous day. Johnson confirmed that the storage unit was mostly cleaned out.

. . . .

On 11/5/10 Det. Coblantz and I checked the 5 storage facilities in Monroe WA. The only one that we found that had a storage unit in the name of Rachel Dunham was at Calico Discount Mini Storage, 17101 147 ST SE, County of Snohomish, Monroe, Washington. We spoke with employee Renee Gese and she provided the rental agreement stating that on 9/13/10 Rachel Dunham rented unit 18. Dunham provided her driver's license, address and Social Security Number in order to rent the unit. Gese gave us the access code and told us where Dunham's storage unit was. Det. Coblantz and I located the storage unit and confirmed it is still locked and secure. Det. Coblantz is currently at the unit maintaining the integrity of the scene until I can apply for a warrant.

Blair contends that the information in the affidavit was stale because several weeks passed from the time his wife rented the Monroe storage unit on September 13, 2010, and the date of the warrant, November 5, 2010. But this is not the correct time frame for determining staleness. As discussed above, the relevant times are (1) when the affiant received the tip and (2) when the informant observed the criminal activity.[23] Thus, the correct time frame would be from when Johnson received and provided the information to the detectives to when the search warrant was obtained.

The affidavit states that Johnson provided this information to detectives on November 3, just two days before the search warrant was obtained. It also states that she told the detectives that the last time she saw the stolen property in the Lynnwood unit was after the Shoreline burglaries, stating that she saw "some valuable swords and the rest of the coins that were stolen in the Shoreline burglary." The affidavit refers to Shoreline burglaries that occurred on

---

[23] Lyons, 174 Wn.2d at 361.

September 18, 2010 (victim Parvanta) and September 26, 2010 (victims Dolliver and Thompson). The affidavit also refers to another Shoreline burglary that occurred "the night before I seized the vehicle from Johnson," where "valuable coins" were stolen. September 28, 2010 is listed in the affidavit as the date Johnson's vehicle was seized.

That affidavit also states that Johnson told detectives that Blair told his wife to move the property after he was arrested. The affidavit states that Blair was arrested on October 21, 2010, and he and Johnson were booked into the King County jail "where they have remained." The affidavit also states that that the unit was last accessed on October 30 and that the detectives confirmed that the Lynnwood unit was mostly empty, on November 3, except for a few items.

The warrant was obtained November 5, 2010. Thus, it was served two days after the detectives received the information, and, at most, a week or two after Blair asked his wife to move the items to the Monroe unit; indeed the Lynnwood unit had been accessed just six days before the warrant was obtained and was not completely empty just one day before.[24] Thus, the court could reasonably infer that some of the stolen property had been moved less than a week before the warrant was sought and was likely to be found in the Monroe unit. Blair fails to show that this relatively short passage of time renders probable cause for the warrant stale. Additionally, the warrant was not seeking a small

---

[24] While Blair asserts that the arrest referred to was an earlier arrest in September, there was no specific reference to this arrest in the affidavit. Thus, a magistrate could have reasonably interpreted this to refer to the October 21 arrest. In any event, as set forth above, additional facts in the affidavit support the inference that items were still being moved to the Monroe storage unit as late as October 30, just a few days before the warrant was issued.

number of items, but evidence of home burglaries committed over several months that were not likely to be consumed or destroyed.

### 3. Evidence of Calls from the Jail

Blair next challenges the admission of evidence of calls he made from the jail to his wife about storing, moving, and selling the stolen property. He contends their admission was a violation of the privacy act, RCW 9.73.030(1), because the calls were protected by the marital privilege. We disagree.

The privacy act prohibits intercepting or recording a private communication transmitted by telephone unless all parties consent.[25] A communication is private when the parties have a subjective expectation that it is private, and that expectation is objectively reasonable.[26] Washington courts have repeatedly held that inmates have no objectively reasonable expectation of privacy in telephone calls from a local jail.[27] This is because inmates have reduced expectation of privacy, further diminished by warnings that telephone calls are recorded and may be monitored.[28]

In Modica, our State Supreme Court held that a jail inmate had no reasonable expectation of privacy in telephone calls he made from the jail to his grandmother when both the defendant and his grandmother knew they were being recorded and that someone might listen to those calls.[29] The jail had a sign posted on the wall above where the calls were made warning that calls

---

[25] RCW 9.73.030(1).
[26] State v. Christensen, 153 Wn.2d 186, 193, 102 P.3d 789 (2004).
[27] State v. Hall, 168 Wn.2d 726, 729 n.1, 230 P.3d 1048 (2010); State v. Modica, 164 Wn.2d 83, 88, 186 P.3d 1062 (2008).
[28] Modica, 164 Wn.2d at 88.
[29] 164 Wn.2d at 88.

would be recorded and monitored, both parties had to listen to an automated recording of this warning, and the parties discussed the fact that their calls were being recorded.[30] The court concluded that given these facts, "[w]hatever expectation of privacy they had, it was not reasonable."[31]

But the court did caution that "we have not held, and do not hold today, that a conversation is not private simply because the participants know it will or might be recorded or intercepted."[32] The court then recognized that intercepting or recording telephone calls violates the privacy act except under narrow circumstances and that the court will "generally presume that conversations between two parties are intended to be private."[33] But the court ultimately concluded that the defendant had no reasonable expectation of privacy "because Modica was in jail, because of the need for jail security, and because Modica's calls were not to his lawyer or otherwise privileged."[34] The court also noted that "such facts may also be relevant to the issue of implied consent," but did not find it necessary to reach the issue of whether the parties impliedly consented to have their conversations recorded.[35]

Blair contends that because his calls to his wife were subject to the marital privilege, he did not lack a reasonable expectation of privacy under Modica because this was a call that was "otherwise privileged," and should therefore be presumed private. We disagree. As the State argues, Blair has failed to

---

[30] Modica, 164 Wn.2d at 88.
[31] Modica, 164 Wn.2d at 88.
[32] Modica, 164 Wn.2d at 88.
[33] Modica, 164 Wn.2d at 89.
[34] Modica, 164 Wn.2d at 89.
[35] Modica, 164 Wn.2d at 89 n.1, 90.

establish a marital privilege because engaging in conversation in the presence of others vitiates a privilege. The State cites case law holding that the marital privilege did not apply to letters from jail to wife from husband when the husband knew all outgoing mail was read by jail personnel.[36] Similarly, no privilege should apply to telephone calls made from jail between spouses who know the calls are being recorded, as was the case here.

As the State further contends, because Blair and his wife consented to the recording, they waived their spousal privilege and any violation of their privacy. The State cites State v. Archie, which held that telephone calls from jail are not "private affairs" protected by article I, section 7 of the Washington State Constitution.[37] There, the court concluded that a jail inmate "expressly consented to recording when she pressed or dialed three to continue the call after the recorded warning" and therefore the recording did not violate article I, section 7.[38] Similarly here, Blair and his wife consented to the recordings by proceeding with the calls after being warned they would be recorded and monitored.

Additionally, while Modica left open the issue of implied consent, the opinion did note that facts such as those in Modica "may also be relevant to the issue of implied consent."[39] The facts here are similar to those in Modica: Blair was in jail, there was a need for jail security, and as discussed above, the calls

[36] State v. Smyth, 7 Wn. App. 50, 53, 499 P.2d 63 (1972).
[37] 148 Wn. App. 198, 204, 199 P.3d 1005 (2009).
[38] Archie, 148 Wn. App. at 204.
[39] 164 Wn.2d at 89 n.1.

were not otherwise privileged. Blair fails to show that the trial court erred by admitting evidence of the jail calls.

Statement of Additional Grounds

Finally, Blair raises a number of issues in a pro se statement of additional grounds for relief, none of which have merit. He asserts claims of prosecutorial misconduct and an invalid search warrant that have already been addressed by appellate counsel and further contends that the trial judge committed misconduct by denying the mistrial and approving the search warrant. As discussed above, these claims lack merit. Blair also contends that the detective's access to personal information about the renter of the Monroe storage unit violated the right to privacy, that the search warrant affidavit contained false information, that the prosecutor committed misconduct by asking leading questions, that his attorney's failure to challenge the search warrant deprived him of effective assistance of counsel, and that the trial court improperly excused a juror for hardship without counsel present.

None of these claims have merit. Blair was not the renter of the Monroe storage unit whose alleged private information was given to police and therefore lacks standing to assert a privacy violation. He also fails to support his claim of false information in the affidavit and show that it was material and deliberately falsified. Additionally, he fails to show the alleged prosecutorial misconduct resulted in prejudice warranting reversal or that counsel's failure to raise every challenge to the search warrant at the trial level resulted in prejudice as such challenges may be raised for the first time on appeal. Finally, he fails to show

how he was prejudiced when the court allegedly improperly excused the juror for hardship.

We affirm.

WE CONCUR: