IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

CHARLES FREEMAN CHRISTIAN,

Appellant.

No. 80045-1-I

ORDER GRANTING
MOTION FOR RECONSIDERATION,
WITHDRAWING OPINION, AND
SUBSTITUTING OPINION

Charles Christian has filed a motion for reconsideration of the opinion filed on June 1, 2021. The State of Washington has not filed a response. The court has determined that the motion for reconsideration shall be granted. The opinion shall be withdrawn, and a substitute opinion shall be filed. Now, therefore, it is hereby

ORDERED that the motion for reconsideration is granted; and it is further

ORDERED that the opinion filed on June 1, 2021 is withdrawn; and it is further

ORDERED that a substitute opinion shall be filed.

_____ Coburn, J.

_____ Brennan, J.

_____ Verellen, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. CHARLES FREEMAN CHRISTIAN, Appellant. | No. 80045-1-I DIVISION ONE PUBLISHED OPINION |

COBURN, J. — A jury convicted Charles Freeman Christian of three domestic violence crimes: assault in the second degree by strangulation or suffocation, assault in the fourth degree, and interfering with the reporting of domestic violence. Christian appeals the assault in the second degree and interfering convictions. Christian contends the trial court abused its discretion in denying his motion for mistrial; the trial court violated his constitutional right to jury unanimity for the assault in the second degree and interfering convictions; and the State failed to include in its initial charging document, and the trial court failed to instruct the jury, that the interfering crime contains a mens rea element. We affirm and hold that interfering with the reporting of domestic violence is a strict liability crime.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

Christian and Sharon La Rae Keith were in a romantic relationship and resided together in Keith's one-bedroom Lynnwood apartment. On December 29, 2018, Keith was lying in bed and heard Christian talking on the phone. Keith heard Christian speak into the phone, "What do you mean you're kicking my son out." Then, Christian left the apartment. Christian returned with his son, Nigel Christian, and Nigel's girlfriend.[1]

Around 10:00 a.m., Keith asked Christian to leave, and they got into a verbal argument in the bedroom. Christian went into the living room and told Nigel, "Wherever I am, you're welcome, too." Keith yelled from the bedroom, "[N]o, he's not." Christian yelled to Nigel, "Do you see what I'm going through, do you see what I'm putting up with[?]" Around 12:00 p.m., Keith and Christian began to argue again. Keith yelled at Christian that she wanted him and Nigel to leave.

Keith grabbed her cell phone and walked toward the bed. Keith later testified she wanted to call 911, but Keith did not tell Christian that was why she grabbed the phone. According to Keith, while she was walking to the bed, Christian yelled, "Bitch, give my phone back," and tried to grab the phone out of Keith's hands. According to Christian, he grabbed for Keith not because he was

---

[1] Because Christian and his son share a last name, we refer to Nigel by his first name for clarity. Neither Nigel nor his girlfriend testified at trial.

reaching for the phone but because he was trying to get his diamond chain necklace that he thought Keith held.

Keith held the phone with both hands, laid on top of the phone and her arms by lying on her stomach on the bed, and began to yell. Christian punched Keith in the back of the head and continued to grab for Keith's hand. At some point, Keith ended up lying on her back. Keith testified that Christian choked her with both of his hands, and the force with which Christian choked Keith made her feel as though she could not breathe and would die.[2] Christian got the phone, stopped choking Keith, and stood up. Christian said to Keith, "I could have just killed you and I love you and that's why I didn't."

Soon after Christian choked Keith, Keith ran to the apartment's balcony and screamed for help.[3] Keith wrapped her arms through the balcony's railing, and Christian repeatedly tried to pry Keith off the railing. Christian struck Keith in the back of the head twice before she let go of the railing. Keith made eye contact with the apartment manager. The apartment manager heard Keith screaming and observed Christian strike Keith a few times and "pull her by her hair." The apartment manager then called 911. A visitor to an adjacent apartment building also heard Keith screaming. Concerned that someone needed help, the visitor ran outside Keith's apartment and saw Christian

---

[2] Christian testified that he did not choke Keith.
[3] Keith also testified that she ran to the balcony between three and four hours after the choking incident. But, Keith testified that she had a hard time differentiating between the physical altercations "because they were so close together."

"grabbing" Keith.  After Keith let go of the railing, Christian went inside the apartment and Keith stayed on the balcony.  When Keith heard police sirens, she ran inside the apartment and told Christian the police were coming.  Then, Keith jumped into bed and began to cry.

Lynnwood Police Officers George Bucholtz and Tanner Hedlund responded to a 911 report of a domestic violence assault.  The officers identified Keith's apartment, repeatedly knocked on the door and announced their presence, and ordered the occupants to open the door.  The officers could hear someone inside the apartment crying.  Between knocks, the officers heard someone inside the apartment reply to their request to open the door by shouting, "No."  According to Keith, Christian yelled through the door, "You cannot come in," and told Nigel not to open the door.  Christian denied telling Nigel or Keith not to open the door.  Christian testified, "I told [Keith], I said answer the door, you're the reason why they're here."

The officers believed there were exigent circumstances—a person being assaulted—permitting them to enter the apartment without first obtaining a warrant.  So, Bucholtz kicked open the apartment door.  The officers found Keith crying and lying under a blanket on the bed and Christian standing at the foot of the bed.  Christian approached the officers swinging his arms and shouting for the officers to "get out."  Bucholtz tried to handcuff Christian by grabbing his right arm, but Christian pulled away.  Bucholtz physically restrained Christian, placed him in handcuffs, and removed him from the apartment.

4

Once outside, Christian told Bucholtz that Keith "had anxiety and that she freaked out" and yelled at Christian and Nigel. Christian also said that "Keith had gone out onto the balcony in her underwear," and Christian was trying "to get her to come back inside."

Hedlund stayed in the apartment with Keith. Hedlund observed Keith's injuries including bruises around her neck, bruises and scrapes on her arms, and a red mark on top of her head. Bucholtz returned to the apartment and observed that Keith was still crying, and that she had abrasions around her neck, redness on her arms, and lumps on her head. Keith told the officers that "she attempted to call 911" but Christian threw the cell phone, so Keith went on the "balcony and screamed for help," and then "Christian came outside and hit her on the head." Keith also said that she went outside "hoping that someone could hear her and call 911 for her."

The State charged Christian with three domestic violence crimes: (1) assault in the second degree by strangulation and suffocation, (2) assault in the fourth degree, and (3) interfering with the reporting of domestic violence.

Before trial, the trial court granted Christian's motion to "[e]xclude all reference to Mr. Christian's current or any previous incarceration." The trial court also ordered that

> no reference be made by counsel or any witness to matters
> previously excluded by the Court. ER 103(c), 401. Similarly, order
> that counsel for both parties make their witnesses aware of the
> pretrial rulings so that the witnesses are careful in their testimony
> and do not violate a court order that could potentially result in a

5

mistrial or prejudice to either party. Witnesses should be shown a
written copy of these rulings if such written copy exists.

During trial, on cross-examination, defense counsel asked Keith, "Now, Mr. Christian doesn't live there anymore; correct?" In response, Keith testified, "Mr. Christian's in jail . . . . He's in jail." A few minutes later, the trial court took a recess and excused the jury. During the recess, the trial court asked the parties if they had any issues to address. They said no. Later, defense counsel asked Keith what happened to Christian's diamond chain. Keith testified, "If it's not with him in jail it's in a box in the closet where all his other stuff is in my apartment." Before going on a lunch recess, the trial court gave the defense another opportunity to raise issues and counsel declined.

After the lunch recess, Christian asserted the State violated the court's pretrial motions. The State conceded to failing to instruct Keith not to mention Christian's current or previous incarceration. Christian then moved for a mistrial.

The State objected to Christian's motion for a mistrial by arguing Christian did not timely object and he waived the issue. The State also argued the prejudice to Christian was minimal because there was evidence that the police arrested Christian at the scene. The State argued, in the alternative, that Christian opened the door to the testimony and the testimony did not violate Christian's right to a fair trial. The State asked for an admonition or curative instruction. Christian argued he did not waive the issue. Christian argued a curative instruction was insufficient because the combination of having police officers present in the courtroom during trial and Keith's references to Christian

6

being in jail would allow jurors to speculate as to why the police officers were present. The trial court responded, "There's no speculation at this point. There was speculation before the testimony. There's no speculation now." Christian then argued the combination of the police presence and Keith's testimony would further allow the jurors to speculate that Christian was a "particularly dangerous person." The trial court noted that when two uniformed police officers are in a courtroom throughout the trial, the jurors could infer the defendant is in custody. Noting that the officers were present throughout Christian's trial, the trial court found the officers' presence did not warrant granting a mistrial.

The trial court denied Christian's motion for a mistrial but offered to provide a curative jury instruction. Christian proposed, and the trial court accepted, jury instruction 6, which stated, "Testimony or evidence regarding incarceration of Mr. Christian shall not be considered or used by you for any purpose whatsoever."

The jury convicted Christian on all three counts.

After the trial court read the verdicts and released the jury, the trial court questioned whether the conviction for the interference crime, count 3, could stand because it lacked a unanimity or Petrich instruction.[4] Jury instruction 15

---

[4] In State v. Petrich, our Supreme Court provided, "When the evidence indicates that several distinct criminal acts have been committed, but defendant is charged with only one count of criminal conduct, jury unanimity must be protected. . . The State may, in its discretion, elect the act upon which it will rely for conviction. Alternatively, if the jury is instructed that all 12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt, a unanimous verdict on one criminal act will be assured. When the State chooses not to elect, this jury instruction must be given to ensure the jury's

provided that to "convict the defendant of the crime of interference with the reporting of a domestic violence offense" the State must prove beyond a reasonable doubt "[t]hat the defendant prevented or attempted to prevent Sharon Keith from calling a 911 emergency communication system or making a report to any law enforcement officer." The trial court stated:

> I don't think that the verdict in relation to Count 3 is appropriate. You can either brief it, or you can agree with my analysis, but when you argued in closing there were two alternative methods in which to commit the crime and there was no unanimity instruction or Petrich instruction, I don't think that verdict could stand. I'm certain it's likely that issue will be appealed, but I do not want this case being returned for that issue. I think it's a problem. So I think that I would have to, in all likelihood, find him not guilty of that charge.

However, at sentencing the trial court concluded a unanimity instruction was not required because the jury could find sufficient evidence to support each alternative means.

Christian appeals.

## DISCUSSION

### Mistrial

Christian argues the trial court abused its discretion when it denied his motion for a mistrial based on Keith's testimony about Christian's incarceration that violated pretrial rulings.

We review a trial court's denial of a motion for a mistrial for abuse of discretion. State v. Rodriguez, 146 Wn.2d 260, 269-70, 45 P.3d 541 (2002). A

_____

understanding of the unanimity requirement." 101 Wn.2d 566, 572, 683 P.2d 173 (1984); see also State v. Carson, 184 Wn.2d 207, 216-17, 357 P.3d 1064 (2015).

trial court "should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). "A trial court's denial of a motion for mistrial will be overturned only when there is a 'substantial likelihood' that the error prompting the request for a mistrial affected the jury's verdict." Rodriguez, 146 Wn.2d at 269-70 (internal quotation marks omitted) (quoting State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons." State v. Brooks, 195 Wn.2d 91, 97, 455 P.3d 1151 (2020).

"[W]hen a trial irregularity occurs, the court must decide its prejudicial effect." State v. Gamble, 168 Wn.2d 161, 177, 225 P.3d 973 (2010). "An irregularity in trial proceedings is grounds for reversal when it is so prejudicial that it deprives the defendant of a fair trial." State v. Condon, 72 Wn. App. 638, 647, 865 P.2d 521 (1993). "In determining the effect of an irregularity, we examine (1) its seriousness; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it." State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989).

Trial courts have wide discretion in curing trial irregularities resulting from improper witness statements. Gamble, 168 Wn.2d at 177. "Courts generally presume jurors follow instructions to disregard improper evidence." Russell, 125 Wn.2d at 84. But, "no instruction can 'remove the prejudicial impression created

9

[by evidence that] is inherently prejudicial and of such a nature as to likely impress itself upon the minds of the jurors.' " State v. Escalona, 49 Wn. App. 251, 255, 742 P.2d 190 (1987) (alteration in original) (quoting State v. Miles, 73 Wn.2d 67, 71, 436 P.2d 198 (1968)). Some curative instructions are insufficient in removing the prejudicial effect of evidence. Gamble, 168 Wn.2d at 177.

The instant case is similar to Condon where a witness testified in violation of a ruling in limine that the defendant was in jail. 72 Wn. App. at 648. The Condon court granted the defendant's motion to strike those comments, denied the defendant's motion for a mistrial, and instructed the jury to disregard references the defendant was in jail. Id. On appeal, we determined the fact that the defendant had been in jail did not mean he was convicted of a crime. Id. at 649. We also determined that, while the statements had the potential for prejudice, they were not serious enough to warrant a mistrial, and the trial court's instruction to disregard the statement was sufficient to cure any potential prejudice. Id.; see also State v. Lewis, 141 Wn. App. 367, 166 P.3d 786 (2007) (no abuse of discretion where the trial court struck testimony that violated a motion in limine and gave a curative jury instruction).

Similar to the trial court in Condon, the trial court below gave a proper curative instruction. The jury could infer Christian was in custody because the officers arrested him at Keith's apartment. Because we assume juries follow instructions, the trial court did not abuse its discretion in denying Christian's motion for a mistrial.

<u>Jury Unanimity</u>

Christian argues the jury instructions for the crimes of assault in the second degree and interfering with the reporting of domestic violence violated his constitutional right to unanimous jury verdicts.  We disagree.

Article I, section 21 of the Washington State Constitution provides defendants the right to a unanimous jury verdict.  The right to a unanimous jury verdict includes the right to unanimity as to which means the State charged the defendant and which act constituted the crime charged.  <u>State v. Bobenhouse</u>, 166 Wn.2d 881, 893, 214 P.3d 907 (2009).  An "alternative means" crime is a single offense that may be committed in more than one way.  <u>State v. Kitchen</u>, 110 Wn.2d 403, 410, 756 P.2d 105 (1988).  A "multiple acts" crime includes several alleged acts, " 'any one of which could constitute the crime charged.' " <u>State v. Garcia Gomez</u>, 7 Wn. App. 2d 441, 457, 434 P.3d 89 (2019) (quoting <u>State v. Crane</u>, 116 Wn.2d 315, 324, 804 P.2d 10 (1991)).  Christian contends both alternative means and multiple acts instructional errors violated his right to a unanimous jury verdict.  We address each claim in turn.

RAP 2.5(a)(3) provides that an "appellate court may refuse to review any claim of error which was not raised in the trial court" unless the claimed error is a "manifest error affecting a constitutional right."  An error is manifest if the appellant can demonstrate actual prejudice through practical and identifiable consequences at trial.  <u>State v. O'Hara</u>, 167 Wn.2d 91, 99, 217 P.3d 756 (2009).  An error is truly of constitutional dimension if it implicates a constitutional interest.

Id. at 98. "If a court determines the claim raises a manifest constitutional error, it may still be subject to a harmless error analysis." Id. "An alleged violation of the right to a unanimous jury verdict is a constitutional challenge that this court reviews de novo." In re Det. of Keeney, 141 Wn. App. 318, 327, 169 P.3d 852 (2007).

*A. Alternative Means*

"Where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means." State v. Nonog, 145 Wn. App. 802, 811-12, 187 P.3d 335 (2008), aff'd, 169 Wn.2d 220, 237 P.3d 250 (2010). "Evidence is sufficient if, viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Owens, 180 Wn.2d 90, 99, 323 P.3d 1030 (2014).

Whether a statute provides an alternative means crime is a question of statutory interpretation. State v. Espinoza, 14 Wn. App. 2d 810, 819, 474 P.3d 570 (2020) (citing Owens, 180 Wn.2d at 96). "[T]he use of a disjunctive 'or' in a list of methods of committing the crime does not necessarily create alternative means of committing the crime, nor does the presence of statutory subsections." Id. (citing State v. Barboza-Cortes, 194 Wn.2d 639, 643-44, 451 P.3d 707 (2019)).

*(i) Assault in the Second Degree*

Christian asserts that a conviction for assault in the second degree must be supported by sufficient evidence for each of the alternative means of strangulation and suffocation. Because no evidence supports suffocation, he contends we should reverse his conviction. We disagree.

Where there are alternative ways to satisfy each alternative means (i.e., "a means within a means"), the alternative means doctrine does not apply. State v. Smith, 159 Wn.2d 778, 783, 154 P.3d 873 (2007) (quoting In re Pers. Restraint of Jeffries, 110 Wn.2d 326, 339, 752 P.2d 1338 (1988)). In other words, "the alternative means analysis does not apply to 'sub alternatives.' " Espinoza, 14 Wn. App. 2d at 819-22 (determining that, even though RCW 9A.46.020 is an alternative means crime, the alternative means doctrine does not apply to the sub alternatives of its subsection (citing Smith, 159 Wn.2d at 783)).

In Smith, our Supreme Court analyzed former RCW 9A.36.021(1) (1988), which contained six separate subsections representing the alternative means of committing the crime of assault in the second degree. 159 Wn.2d at 784. In 2007, the legislature added "[a]ssaults another by strangulation," subsection (g), as another means of finding a person guilty of assault in the second degree. LAWS OF 2007, ch. 9, § 2. In 2011, the legislature added "or suffocation" within subsection (g). LAWS OF 2011, ch. 166, § 1. RCW 9A.36.021(1)(g) provides, "A person is guilty of assault in the second degree if he or she" "[a]ssaults another by strangulation or suffocation."

"When the alleged alternatives are ' "minor nuances inhering in the same act," ' these 'alternatives' are more accurately categorized as ' "facets of the same criminal conduct." ' " Espinoza, 14 Wn. App. 2d at 819 (quoting Barboza-Cortes, 194 Wn.2d at 644 (quoting State v. Sandholm, 184 Wn.2d 726, 734, 364 P.3d 87 (2015))). " 'Strangulation' means to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." RCW 9A.04.110(26). " 'Suffocation' means to block or impair a person's intake of air at the nose and mouth, whether by smothering or other means, with the intent to obstruct the person's ability to breathe." RCW 9A.04.110(27). Here, strangulation and suffocation are two "facets of the same criminal conduct" of restricting a person's ability to breathe.

Assault in the second degree is an alternative means crime because it is a single criminal offense with seven separate subsections, (a) through (g), representing the alternative means of committing the offense. RCW 9A.36.021(1). Here, the State charged Christian with violating RCW 9A.36.021(1)(g), which is one of the seven alternative means of committing assault in the second degree. "We presume the legislature is 'familiar with judicial interpretations of statutes and, absent an indication it intended to overrule a particular interpretation, amendments are presumed to be consistent with previous judicial decisions.' " State v. Ervin, 169 Wn.2d 815, 825, 239 P.3d 354 (2010) (quoting State v. Bobic, 140 Wn.2d 250, 264, 996 P.2d 610 (2000)).

14

Thus, the legislature was aware of <u>Smith</u> and the interpretation of RCW 9A.36.021(1) as an alternative means crime before it elected to add "suffocation" within the same alternative means of "strangulation."  By electing not to add suffocation as its own distinct subsection, the legislature chose not to make suffocation its own alternative means of committing assault in the second degree.  Thus, strangulation and suffocation are "sub alternatives" or "means within a means" within RCW 9A.36.021(1)(g).  Strangulation and suffocation are not alternative means in RCW 9A.36.021(1).

Christian argues that even if strangulation and suffocation are not alternative means of committing assault in the second degree, under the law of the case doctrine, they became alternative means when the jury was so instructed, as proposed by the State.  We disagree.

The trial court instructed the jury that to convict Christian of the crime of assault in the second degree, the State must prove beyond a reasonable doubt

> (1) [t]hat on or about the 29th day of December, 2018, the
> defendant intentionally assaulted Sharon Keith by
> a. strangulation or
> b. suffocation . . . .

Christian was tried for, and the jury was instructed, on assault in the second degree by strangulation or suffocation and no other alternative means of committing assault in the second degree.  However, the trial court instructed the jury as if strangulation and suffocation were alternative means:

> To return a verdict of guilty, the jury need not be unanimous as to
> which of alternatives (1)(a) or (1)(b) has been proved beyond a

reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

This instruction is consistent with the Washington Pattern Jury Instructions for alternative means crimes. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.23 (4th ed. 2016) (WPIC).

The law of the case doctrine "refers to the principle that jury instructions that are not objected to are treated as the properly applicable law for purposes of appeal." Roberson v. Perez, 156 Wn.2d 33, 41, 123 P.3d 844 (2005). Under this doctrine, "[i]n criminal cases, the State assumes the burden of proving otherwise unnecessary elements of the offense when such added elements are included without objection in the 'to convict' instruction." State v. Hickman, 135 Wn.2d 97, 102, 954 P.2d 900 (1998). The law of the case doctrine does not apply to the instant case where the to-convict instruction did not contain an added element.

In State v. Makekau, Division Two of this court determined possession of a stolen motor vehicle was not an alternative means crime even though the statute, and subsequent to-convict instruction, included a disjunctive "or" list of methods of committing that crime. 194 Wn. App. 407, 419, 378 P.3d 577 (2016). There, the terms "received, possessed, concealed, or disposed of" were methods rather than alternative means of committing possession. Id. at 419-20. Because possession of a stolen motor vehicle was not an alternative means crime, and the jury was not provided additional elements, "the State was required to prove only that Makekau's conduct satisfied one of the disjunctive terms." Id. at 420.

16

Similar to <u>Makekau</u>, here, consistent with RCW 9A.36.021(1)(g), the instruction properly provided the only two means within the means of finding assault in the second degree. While the trial court erred in providing the alternative means instruction because strangulation and suffocation are means within a means, the State was not required to prove both sub alternatives beyond a reasonable doubt. Thus, the error was harmless.

As Christian concedes, there was sufficient evidence to support a conviction for strangulation. Keith testified to Christian choking her, and the responding officers testified to observing bruising and abrasions around Keith's neck. Thus, sufficient evidence supports a conviction for assault in the second degree by strangulation.

Because strangulation and suffocation are means within a means and because Christian's conviction is supported by sufficient evidence that he strangled Keith, we find no reversible error. <u>See</u> <u>Sandholm</u>, 184 Wn.2d at 736 (determining, because the former driving under the influence statute "does not create alternative means, and because Sandholm's conviction is supported by sufficient evidence that he drove under the influence of alcohol, we find no error").

*(ii)  Interfering with the Reporting of Domestic Violence*

Christian contends the trial court erred by not instructing the jury that interfering with the reporting of domestic violence is an alternative means crime. Christian contends this is a reversible error. We disagree.

This court has determined the crime of interfering with the reporting of domestic violence is an alternative means crime. Nonog, 145 Wn. App. at 811-12.[5] RCW 9A.36.150(1)(b) provides, "A person commits the crime of interfering with the reporting of domestic violence if the person" "[p]revents or attempts to prevent the victim of or a witness to that domestic violence crime from calling a 911 emergency communication system, obtaining medical assistance, or making a report to any law enforcement official." In other words, the statute sets forth three alternative means of committing the crime of interfering: (1) preventing someone from calling a 911 communication system, (2) preventing someone from obtaining medical assistance, and (3) preventing someone from making a report to any law enforcement officer.

In the instant case, the trial court did not instruct the jury that interfering with the reporting of domestic violence is an alternative means crime. Instead, jury instruction 15 provided,

> To convict the defendant of the crime of interference with the reporting of a domestic violence offense, each of the following elements of the crime must be proved beyond a reasonable doubt:
> . . . .
> (3) That the defendant prevented or attempted to prevent Sharon Keith *from calling a 911 emergency communication system* or *making a report to any law enforcement officer*.

---

[5] On appeal to the Supreme Court, the parties in Nonog did not challenge our determination that interfering with reporting domestic violence is an alternative means crime. Nonog, 169 Wn.2d 220. The court affirmed Nonog without reaching the issue. We decline the State's invitation to reconsider whether interfering with the reporting of domestic violence is an alternative means crime.

(Emphasis added). After the verdict, the trial court recognized that it did not give the jury a unanimity instruction. Christian contends this is a reversible error. Because the State presented sufficient evidence to support each of the two alternative means listed in the court's instruction, we disagree.

First, the State presented sufficient evidence that Christian prevented or attempted to prevent Keith from calling 911. At trial, Keith testified to holding onto the phone with both hands until Christian punched and choked her. Keith testified that once Christian got the phone, he stopped choking her and stood up. Also at trial, the responding officers testified that Keith reported "she attempted to call 911" and that Christian threw the cell phone. Officers also testified Keith said she went onto the balcony "hoping that someone could hear her and call 911 for her." Viewing the evidence in the light most favorable to the State, any rational juror could have found beyond a reasonable doubt that Christian prevented or attempted to prevent Keith from calling 911.

Second, the State presented sufficient evidence that Christian prevented or attempted to prevent Keith from making a report to any law enforcement officer. Keith testified that, after officers knocked on her apartment door, Christian yelled through the door, "You cannot come in" and told Nigel not to open the door. The reporting officers testified they repeatedly knocked on Keith's apartment door, announced their presence, and ordered the occupants to open the door. They also testified that between knocks, they heard someone inside crying and someone else shout "No" to their request to open the door. After the

19

officers forced their way into the apartment, they found Keith crying and lying under a blanket on the bed and Christian standing at the foot of the bed. Christian then approached the officers swinging his arms and shouting for the officers to "get out." Viewing the evidence in the light most favorable to the State, any rational juror could have found beyond a reasonable doubt that Christian prevented or attempted to prevent Keith from making a report to any law enforcement officer by refusing the police entry into the apartment and ordering Nigel not to answer the door.

"[W]hen there is sufficient evidence to support each of the alternative means of committing the crime, express jury unanimity as to which means is not required." Owens, 180 Wn.2d at 95. Because there was sufficient evidence to support each alternative means listed in the trial court's instruction, the trial court did not violate Christian's right to a unanimous verdict.

B. Multiple Acts

Christian also contends the trial court erred by not providing a jury unanimity instruction and not ensuring unanimity as to which particular act the jury relied upon to convict him of the crime of interfering with the reporting of domestic violence. We disagree.

To convict a defendant of a multiple acts crime, the State must elect the act on which it relies to convict the defendant, or the trial court must provide a unanimity instruction and the jury must unanimously agree as to which act constituted the crime charged. Bobenhouse, 166 Wn.2d at 893. The failure to

provide the jury with a unanimity instruction can be a constitutional error because it creates a "possibility that some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." Kitchen, 110 Wn.2d at 411. When multiple acts form a continuing course of criminal conduct, the State need not make an election or provide a unanimity instruction. State v. Rodriguez, 187 Wn. App. 922, 936, 352 P.3d 200 (2015) (citing Crane, 116 Wn.2d at 330).

To determine whether multiple acts form one continuing offense, we "must view the facts in a commonsense manner." Rodriguez, 187 Wn. App. at 937 (citing Petrich, 101 Wn.2d at 571). "Evidence that multiple acts were intended to secure the same objective supports a finding that the defendant's conduct was a continuing course of conduct." Id. at 937 (citing State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989)). "Courts also consider whether the conduct occurred at different times and places or against different victims." Id.

The State contends, and we agree, a unanimity instruction was not required because Christian's acts formed a continuous course of criminal conduct. By taking Keith's phone, Christian prevented Keith from calling 911. Christian then repeatedly tried to pull Keith off the balcony while she screamed for help. After hearing sirens, Keith told Christian the police were coming and jumped into bed crying. By standing at the foot of Keith's bed and yelling "no" to the police's request to open the door, Christian attempted to prevent Keith from making a report to any law enforcement official. Both acts had the same

objective—to interfere with Keith's reporting of domestic violence. This all occurred on the same day, in the same apartment, and against the same victim. Because Christian's acts formed a continuous course of criminal conduct, the State was not required to elect which act or to provide the jury with a unanimity instruction. Accordingly, the trial court did not violate Christian's right to a unanimous verdict.

### Culpable Mental State

Christian argues his conviction for interfering with the reporting of domestic violence should be reversed because the crime requires an element of a culpable mental state, which neither the charging information nor the to-convict instruction contained.[6] Because we determine the crime of interfering with the reporting of domestic violence is a strict liability offense, we disagree.

Whether the crime of interfering with the reporting of domestic violence contains a mens rea element or is a strict liability crime presents questions of law that are reviewed de novo. State v. Yishmael, 195 Wn.2d 155, 163, 456 P.3d 1172 (2020).[7]

Under common law "strict liability crimes [were] disfavored." State v. Anderson, 141 Wn.2d 357, 367, 5 P.3d 1247 (2000); Yishmael II, 195 Wn.2d at 163. The State was required to "prove both a bad act and a bad intent."

---

[6] Christian argues this court should read the statute to include an implied mens rea element of intentional or knowing prevention of reporting. Christian provides no argument as to which mens rea this court should infer.

[7] For clarity, we refer to State v. Yishmael, 195 Wn.2d 155, 456 P.3d 1172 (2020) as "Yishmael II" because it followed State v. Yishmael, 6 Wn. App. 2d 203, 430 P.3d 279 (2018), which we refer to as "Yishmael I."

Yishmael II, 195 Wn.2d at 163.  But, our legislature has plenary power to create strict liability crimes.  State v. Blake, 197 Wn.2d 170, 179, 481 P.3d 521 (2021) (citing Yishmael II, 195 Wn.2d at 163).  "Strict liability crimes" are crimes that "criminalize conduct regardless of whether the actor intended wrongdoing."  Id. (quoting Yishmael II, 195 Wn.2d at 163).  Strict liability crimes require the State prove actus reus but do not require the State to prove mens rea.[8]  "In particular, the legislature may create 'strict liability offenses to protect the public from the harms that have come with modern life by putting the burden of care on those in the best position to avoid those harms.' "  Id. (quoting Yishmael II, 195 Wn.2d at 164).

"[W]hether a statute sets forth a strict liability crime is a statutory construction question aimed at ascertaining legislative intent.  The inquiry begins with the statute's language and legislative history."  State v. Bash, 130 Wn.2d 594, 604-05, 610, 925 P.2d 978 (1996); see also Blake, 197 Wn.2d at 193 (confirming that "when the legislature enacts a statute without explicit mens rea language, we will still look to the statutory language, the legislative history, and a series of nonexclusive factors to determine 'whether the legislature intended to create a strict liability offense.' " (quoting Yishmael II, 195 Wn.2d at 164-66)).  We consider the "statute's context, and the interplay with related statutes." Yishmael II, 195 Wn.2d at 164.

---

[8] "Actus reus" is a voluntary act. BLACK'S LAW DICTIONARY 45-46 (11th ed. 2019).

RCW 9A.36.150 provides,

> (1) A person commits the crime of interfering with the reporting of domestic violence if the person:
> (a) Commits a crime of domestic violence, as defined in RCW 10.99.020; and
> (b) Prevents or attempts to prevent the victim of or a witness to that domestic violence crime from calling a 911 emergency communication system, obtaining medical assistance, or making a report to any law enforcement official.
> (2) Commission of a crime of domestic violence under subsection (1) of this section is a necessary element of the crime of interfering with the reporting of domestic violence.
> (3) Interference with the reporting of domestic violence is a gross misdemeanor.

The text of RCW 9A.36.150 does not include an explicit mens rea element. A statute's "failure to be explicit regarding a [mens rea] element is not, however, dispositive of legislative intent." Anderson, 141 Wn.2d at 361. Thus, we next consider RCW 9A.36.150's legislative history. Blake, 197 Wn.2d at 193; Yishmael II, 195 Wn.2d at 166.

As Christian asserts and the State concedes, RCW 9A.36.150's legislative history does not include a statement of legislative intent. The legislative history does not answer the questions of whether the legislature intended to include a mens rea element or whether the legislature purposefully omitted that element.

Christian argues that because RCW 9A.36.150 does not establish an affirmative defense, the legislature intended there to be a mens rea element. In Anderson, the Washington State Supreme Court considered whether the crime of unlawful possession of a firearm in the second degree contained an implicit mens rea element or was a strict liability crime. 141 Wn.2d at 360. The court found

24

"the legislative history [was] not conclusive on the issue of the Legislature's intent." Id. at 362-63. There, the legislature's "failure to provide in the statute for the affirmative defense of unwitting conduct or to expressly eliminate lack of knowledge as a defense [were] . . . other indicators of its intent to make [mens rea] an element of the offense." Id. In other words, we consider the fact that a statute does not include an affirmative defense or does not expressly eliminate the lack of knowledge as an affirmative defense as indicative of the legislature's intent to create a mens rea element.

The State asserts the language of RCW 9A.36.150 "gives conflicting signals as to the legislative intent" for two reasons. First, the State asserts RCW 9A.36.150(1)(a) requires that the defendant commit a domestic violence crime as defined in RCW 10.99.020, and some of those domestic violence crimes have express mens rea elements but others do not. The State cites rape in the first degree, RCW 9A.44.040, as a crime that does not have a mens rea element and that it is listed as a potential domestic violence crime defined in RCW 10.99.020.[9]

Second, the State acknowledges that RCW 9A.36.150(1)(b) includes the phrase "prevents or attempts to prevent," which "suggests a mental state under some circumstances but not others." The State argues the court should determine that "[o]nly the word 'attempt' indicates an intentional act." In criminal

---

[9] However, "the general rape statutes require forcible compulsion or an unwilling or incapacitated victim." State v. Johnson, 173 Wn.2d 895, 907, 270 P.3d 591 (2012) (citing RCW 9A.44.040, .050, .060).

law, "attempt" is "[a]n overt act that is done with the *intent* to commit a crime but that falls short of completing the crime." BLACK'S LAW DICTIONARY 158 (11th ed. 2019) (emphasis added).

When the statute's language and legislative intent are not determinative as to whether a crime includes a mens rea element, we use the eight "nonexclusive" factors identified in Bash "as aids in determining whether the Legislature has created a strict liability crime." Anderson, 141 Wn.2d at 363 (citing Bash, 130 Wn.2d at 605-06); Yishmael II, 195 Wn.2d at 166; see Blake, 197 Wn.2d at 193 (courts still consider the Bash factors). The Bash factors are

> (1) a statute's silence on a mental element is not dispositive of legislative intent; the statute must be construed in light of the background rules of the common law, and its conventional mens rea element; (2) whether the crime can be characterized as a "public welfare offense" created by the Legislature; (3) the extent to which a strict liability reading of the statute would encompass seemingly entirely innocent conduct; (4) and the harshness of the penalty . . .[;] (5) the seriousness of the harm to the public; (6) the ease or difficulty of the defendant ascertaining the true facts; (7) relieving the prosecution of difficult and time-consuming proof of fault where the Legislature thinks it important to stamp out harmful conduct at all costs, "even at the cost of convicting innocent-minded and blameless people"; and (8) the number of prosecutions to be expected.

130 Wn.2d at 605-06 (quoting 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 3.8, at 341 (1986). "All of these factors are to be read in light of the principal that offenses with no mental element are generally disfavored." Anderson, 141 Wn.2d at 363.

First, we consider the statute "in light of the background rules of common law, and its conventional mens rea element." Bash, 130 Wn.2d at 605. As the

State correctly notes and Christian does not dispute, there is no common law equivalent to the crime of interfering with the reporting domestic violence. The State correctly asserts this factor is "unhelpful." State v. Williams, 158 Wn.2d 904, 911, 148 P.3d 993 (2006) (determining this factor is unhelpful where the statute has no common law predecessor).

Second, we consider "whether the crime can be characterized as a 'public welfare offense' created by the Legislature." Bash, 130 Wn.2d at 605. Generally, public welfare offenses do not require proof of intent or a mental state. Id. at 607. In other words, "the legislature may create 'strict liability offenses to protect the public.' " Blake, 197 Wn.2d at 179 (quoting Yishmael II, 195 Wn.2d at 164). Public welfare offenses tend to be "regulatory offenses" "involving 'pure food and drugs, labeling, weights and measures, building, plumbing and electrical codes, fire protection, air and water pollution, sanitation, highway safety and numerous other areas.' " Bash, 130 Wn.2d at 607 (quoting State v. Turner, 78 Wn.2d 276, 280, 474 P.2d 91 (1970)). Public welfare offenses

> are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize.

Morissette v. United States, 342 U.S. 246, 255-56, 72 S. Ct. 240, 96 L. Ed. 288 (1952).

27

Crimes that are *not* public welfare offenses are "moral turpitude" offenses and categorized as malum in se crimes.[10] State v. Smith, 17 Wn. App. 231, 234, 562 P.2d 659 (1977). Moral turpitude offenses generally "require a mental element, some level of 'guilty knowledge,' even if the statute does not specify that element." Bash, 130 Wn.2d at 606-07 (quoting Turner, 78 Wn.2d at 280).

Christian asserts, "The crime of interfering with reporting of domestic violence is a crime of moral turpitude, not a public welfare offense" because "it prevents the victim from obtaining needed aid" and there is an "immediate harm" to the victim.

The State agrees the offense of interfering with the reporting of domestic violence is not technically a public welfare offense because it is not a regulatory offense. But, the State argues the offense of interfering with the reporting of domestic violence shares some aspects of public welfare offenses because its harm extends beyond the victim to society. We address the State's argument below in our consideration of Bash factor five examining the "seriousness of the harm to the public."

The crime of interfering with the reporting of domestic violence is more similar to a crime of moral turpitude than to a public welfare offense. As previously noted, many public welfare offenses "result in no direct or immediate injury to person." Morissette, 342 U.S. at 255-56. Unlike public welfare offenses,

---

[10] A "malum in se" crime is a "crime or an act that is inherently immoral, such as murder, arson, or rape." BLACK'S, supra, at 1148.

as Christian asserts, the crime of interfering with the reporting of domestic violence may involve immediate harm to the victim. Thus, this factor weighs in favor of finding a mens rea element.

Third, we consider "the extent to which a strict liability reading of the statute would encompass seemingly entirely innocent conduct." Bash, 130 Wn.2d at 605. "[A] statute will not be deemed to be one of strict liability where such construction would criminalize a broad range of apparently innocent behavior." Anderson, 141 Wn.2d at 364.

Christian provides a number of examples of how RCW 9A.36.150 would criminalize a broad range of seemingly innocent behavior if it is a strict liability crime. For example, Christian asserts, "Suppose an assault victim, sometime after being assaulted, contemplates calling 911 but, before moving to pick up the phone and without announcing her intention, the defendant picks up the phone to call someone else, thereby preventing her from calling 911." Christian's hypothetical fails to provide other context that a jury could consider such as whether the assault victim was able to pick up the phone moments later and make the call or whether the assailant dominated the use of the phone for the rest of the evening. Regardless of the circumstances, the jury is to consider circumstances in determining if the assailant, beyond a reasonable doubt, prevented or attempted to prevent the victim from making that call.

More importantly, Christian's hypothetical ignores the fact that it was the defendant who created the situation where the victim would have a reason to call

a 911 emergency communication system, obtain medical assistance, or make a report to any law enforcement official. In other words, the State still has to prove the defendant committed a crime of domestic violence. The statute only criminalizes the active, not passive, conduct of interfering with the reporting of domestic violence after having committed a domestic violence crime.[11] This is not wholly innocent nonconduct.

Furthermore, Christian's request to add a mens rea element creates a potentially dangerous situation. It is reasonable that a victim of domestic violence would not want the defendant to know that the victim was trying to call for help or report the crime. Requiring the defendant to know the victim was trying to seek help does not contemplate the circumstances of domestic violence.

The State argues a defendant can only commit the crime of interfering with the reporting of domestic violence only if that defendant commits a crime of domestic violence so the crime does not criminalize a broad range of innocent behavior. State v. Burch is analogous on this factor. 197 Wn. App. 382, 394, 389 P.3d 685 (2016). In Burch, Division Two of this court considered whether vehicular homicide committed while under the influence of alcohol or drugs was a strict liability crime. Id. at 393. The court considered the fact that the underlying crime of driving under the influence is a serious criminal offense. Id. at 394. "Because vehicular homicide while under the influence of intoxicating liquor or

---

[11] Cf. Blake, 197 Wn.2d at 193 (holding the felony of unknowing possession of a controlled substance unconstitutionally criminalized "wholly innocent and passive nonconduct on a strict liability basis").

drugs requires the State to prove the facts of both impairment and operation of a motor vehicle, the crime necessarily encompasses primarily or solely criminal behavior." Id. at 395. As the State asserts, to convict a defendant of the crime of interfering with the reporting of domestic violence, the State must prove and the trier of fact must find the defendant committed a domestic violence crime. The underlying crime of domestic violence is a serious criminal offense. Thus, the crime of interfering with the reporting of domestic violence does not criminalize a broad range of innocent behavior. This factor weighs in favor of strict liability.

Fourth, we consider "the harshness of the penalty." Bash, 130 Wn.2d at 605. " '[T]he greater the possible punishment, the more likely some fault is required; and, conversely, the lighter the possible punishment, the more likely the legislature meant to impose liability without fault.' " Id. at 608-09 (quoting 1 LAFAVE & SCOTT, supra, § 3.8, at 343. Interfering with the reporting of domestic violence is a gross misdemeanor subject to a possible 364 days in jail. RCW 9A.36.150(3); RCW 9A.20.021.

Christian argues generally that a person convicted of a felony may receive a lighter sentence than a person convicted of a gross misdemeanor a person convicted of both interfering with the reporting of domestic violence and a felony may receive a harsher sentence and a person convicted of a gross misdemeanor will face numerous societal hardships.

As the State points out, courts have found that an offense that is a gross misdemeanor weighs in favor of concluding it is a strict liability offense (citing

Yishmael II, 195 Wn.2d at 170 (Generally, a first offense for the unlawful practice of law would be a misdemeanor and weighs in favor of reading the crime as a strict liability offense.)).

Furthermore, courts have found that felonies that carry a maximum penalty of five years of imprisonment "weigh in favor" of a reading that the crime "is *not* one of strict liability." Anderson, 141 Wn.2d at 365 (emphasis added); see also State v. Warfield, 119 Wn. App. 871, 881-82, 80 P.3d 625 (2003) (agreeing with the Anderson court that "a five-year prison term is not inconsequential" and is a " 'harsh' penalty").

Because RCW 9A.36.150 is a gross misdemeanor that carries a potential maximum penalty of 364 days of jail, the penalty factor weighs in favor of reading RCW 9A.36.150 as a strict liability crime.

Fifth, we consider "the seriousness of the harm to the public." Bash, 130 Wn.2d at 605. " '[T]he more serious the consequences to the public, the more likely the legislature meant to impose liability without regard to fault, and vice versa.' " Id. at 610 (quoting 1 LaFave & Scott, supra, § 3.8, at 343).

Without citation to any authority, Christian contends that while defendants charged with interfering with the reporting of domestic violence may harm the victim, such defendants do not harm the general public. The State argues that the legislature recognizes that domestic violence is a serious societal issue that poses immediate risk of harm to victims and their families as stated in the

purpose and intent of chapter 10.99 RCW.[12]  The legislature created chapter

10.99 RCW to address domestic violence.  The State points to the legislature's

explicit recognition of why it created this chapter:

> The purpose of this chapter is to recognize the importance of domestic violence as *a serious crime against society*. . . . Only recently has public perception of the serious consequences of domestic violence *to society* and to the victims led to the recognition of the necessity for early intervention by law enforcement agencies.

RCW 10.99.010 (emphasis added).  The State also cites RCW 9.94A.535(3),

which provides "an exclusive list of factors that can support a felony sentence

above the standard range."  One of the aggravating factors is where "[t]he current

offense involved domestic violence . . .  and one or more of the following was

present":

> (i) The offense was part of an ongoing pattern of psychological, physical, or sexual abuse of a victim or multiple victims manifested by multiple incidents over a prolonged period of time;
> (ii) The offense occurred within sight or sound of the victim's or the offender's minor children under the age of eighteen years; or
> (iii) The offender's conduct during the commission of the current offense manifested deliberate cruelty or intimidation of the victim.

RCW 9.94A.535(3)(h).  These statutes reflect the legislature's awareness that

the impact of domestic violence goes beyond the victim.

---

[12] The United States Centers for Disease Control and Prevention recognizes "Intimate Partner Violence" as "a serious, preventable public health problem that affects millions of Americans. The term 'intimate partner violence' describes physical violence, sexual violence, stalking, or psychological harm by a current or former partner or spouse." https://www.cdc.gov/ViolencePrevention/intimatepartner violence/index.html (last updated Oct. 9, 2020).

Christian also generally asserts the purpose of criminal law is to deter conduct, and punishment for crimes without a mental element does not further the goal of deterrence. Christian cites Anderson, 141 Wn.2d at 365, and Bash, 130 Wn.2d at 610.

Both Anderson and Bash are distinguishable. The Anderson court concluded that "[w]hile one can easily argue that there is danger to society if persons who have been convicted of certain crimes knowingly possess firearms, we fail to see how their unwitting possession of a firearm poses a significant danger to the public. Neither does the punishment of such persons further a goal of deterrence." 141 Wn.2d at 365. The Bash court considered the crime of possessing a potentially dangerous or dangerous dog that severely injures or causes the death of another. 130 Wn.2d at 598-99. The Bash court concluded that "[w]hether a strict liability standard would accomplish the goal of deterrence is doubtful, however, because unless the owner knows or reasonably should know of the dog's dangerous propensities, it is unlikely that the owner would think it necessary to use extraordinary care in controlling the dog." Id. at 610.

Unlike the defendant who unwittingly possessed a firearm or unknowingly possessed a dangerous dog, defendants who interfered with the reporting of domestic violence are not defendants who innocently found themselves in that circumstance. They are defendants, as the State points out, who committed a domestic violence crime against the victim, and these defendants need only

34

"stand aside and allow the victim to call the police or seek medical attention." Thus, deterrence is not doubtful.

Because domestic violence is a serious crime against society, the crime of interfering with the reporting of domestic violence is one way to try to reduce public harm. This factor weighs in favor of strict liability.

Sixth, we consider "the ease or difficulty of the defendant ascertaining the true facts." Id. at 605. " '[T]he harder to find out the truth, the more likely the legislature meant to require fault in not knowing; the easier to ascertain the truth, the more likely failure to know is no excuse.' " Yishmael II, 195 Wn.2d at 170-71 (alteration in original) (quoting 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 5.5(a), at 518-19 (3d ed. 2017)). In other words, the easier it is for a defendant to discover the facts surrounding their actions, the more likely the legislature meant to impose strict liability for those actions.

In Yishmael II, the Washington State Supreme Court determined that it "is not difficult to ascertain that filling out legal documents for a fee is the practice of law." Id. at 171. Here, it is not difficult to ascertain that victims of domestic violence may want to call for help or make a report to a law enforcement officer and that the defendant should not interfere with the victim's ability to do so.

Christian argues this factor is "unilluminating because the circumstances under which a person may prevent a report are varied." Christian asserts the victim of domestic violence is in the superior position to know whether they intend to make a report. The State argues that because "the defendant will already

*know* what he did, and who he did it to, he is in possession of facts that amount to a crime." (Emphasis added.) The State also argues "the defendant will know if the victim has reached for a phone, attempts to leave the apartment, or attempts to contact a law enforcement officer on the street nearby."

It is true that there are circumstances where the victim makes it known, either intentionally or unintentionally, to the defendant that the victim wants to call for help. However, it is also true that even in situations where a victim does not want the defendant to know they are trying to call for help, the defendant is still in the best possession to know facts that amount to a crime. The question is not whether defendants know that victims intend to call for help; it is whether defendants who commit domestic violence crimes should inherently know by committing domestic violence they are creating circumstances whereby victims may want to make that call. Thus, it is not difficult for defendants under these circumstances to ascertain that their conduct prevents or attempts to prevent victims from calling for help. This factor weighs in favor of concluding the offense is a strict liability crime.

Seventh, we consider whether it would be "relieving the prosecution of difficult and time-consuming proof of fault where the [l]egislature thinks it important to stamp out harmful conduct at all costs, 'even at the cost of convicting innocent-minded and blameless people.' " Bash, 130 Wn.2d at 606 (quoting 1 LaFave & Scott, supra, § 3.8, at 341 (1986)). Courts have found this factor to weigh in favor of strict liability when defendants could easily claim

another reason for their conduct. See State v. Mertens, 148 Wn.2d 820, 830, 64 P.3d 633 (2003) (explaining that defendants charged with commercial fishing without a license could "easily claim noncommercial intent").

Christian argues the "State routinely proves a culpable mental state beyond a reasonable doubt based on circumstantial evidence alone," so requiring the State to do so here would not be time consuming or difficult. The State agrees that it frequently takes on the burden of proving a mental state but also asserts the risk of convicting innocent minded persons is low because that person had committed a domestic violence crime against the victim. The State ultimately argues this factor "neither favors nor disfavors finding the crime has a mental element."

In the circumstance of domestic violence, defendants could easily claim they did not know the victim wanted to call for help, and defendants could easily claim another reason for their behavior. Christian's own hypothetical provides an example of that. It is doubtful that the legislature requires someone who is a victim of domestic violence to have to alert the assailant that they wish to call for help. The concern of convicting someone who is innocent minded and blameless is remote because evidence must support beyond a reasonable doubt that the person who interfered is the person who committed a domestic violence crime. This factor weighs in favor of strict liability.

Eighth, we consider "the number of prosecutions to be expected." Bash, 130 Wn.2d at 606.

37

Historically, some courts did not address this factor where the record did not include the number of prosecutions or provide some form of statistical analysis to show the number of expected prosecutions. See e.g., Anderson, 141 Wn.2d at 365 (declining to address factor eight because "the record tells us nothing about the number of persons who are prosecuted for the offense"); Warfield, 119 Wn. App. at 883 (declining to address factor eight because the parties did not provide "statistical analysis concerning the number of expected prosecutions if we find that RCW 9.41.190 creates a strict liability offense").

Recently, courts address this factor by looking at the number of appellate cases referenced in legal databases. In Yishmael I, this court looked at the number of appellate opinions on the criminal prosecution of the unlawful practice of law. 6 Wn. App. 2d at 220. This court determined that because there were few appellate opinions, it is "reasonable to infer that criminal prosecutions for this offense are rare," and "[t]his factor weighs in favor of strict liability." Id. But, in Yishmael II, the Supreme Court came to the opposite conclusion: " 'The fewer the expected prosecutions, the more likely the legislature meant to require the prosecuting officials to go into the issue of fault; the greater the number of prosecutions, the more likely the legislature meant to impose liability without regard to fault.' " 195 Wn.2d at 171-72 (quoting 1 LAFAVE & SCOTT, supra, § 5.5(a) at 520 (3d ed.). The Supreme Court determined, "[G]iven the very few prosecutions mentioned in the appellate record it is likely the legislature did not intend many prosecutions. This factor weighs against strict liability." Id. at 172.

Here, the State asserts, according to Westlaw,[13] appellate courts have reviewed "more than 60 cases" where the State charged a defendant with the crime of interfering with the reporting of domestic violence.  The State argues these 60 cases weigh in favor of finding strict liability.

Another indicator of whether a crime is rare is whether a pattern jury instruction exists for the specific crime.  Yishmael II, 195 Wn.2d at 169 (considering the nonexistence a pattern jury instruction for the crime of the unlawful practice of law as a sign that prosecutions of the crime were rare).  A pattern jury instruction for the crime of interfering with the reporting of domestic violence exists.  See WPIC 36.57.  And, in Christian's case, the trial court provided the jury with an instruction based on the pattern instruction.

Following the Supreme Court's analysis in Yishmael II, this factor weighs in favor of strict liability.

While we need not consider all the Bash factors, on balance, the factors

---

[13] Westaw is an online legal database and research service.

weigh in favor of strict liability. Therefore, we affirm and hold that interfering with the reporting of domestic violence is a strict liability crime.[14]

WE CONCUR:

---

[14] Christian challenges the validity of the charging document and to-convict instructions for missing a mens rea element. Because the crime of interfering with the reporting of domestic violence is a strict liability crime, the to-convict instruction and charging document were sufficient.