# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| STATE OF WASHINGTON, | DIVISION ONE |
| Respondent, | No. 83660-9-I |
| v. | UNPUBLISHED OPINION |
| MARVIN ANTONIO LILLY, | |
| Appellant. | |

DWYER, J. — Marvin Lilly appeals from the judgment entered on a jury's verdicts finding him guilty of assault in the second degree while armed with a firearm and unlawful possession of a firearm in the first degree. On appeal, he contends that the trial court impermissibly commented on the evidence and erroneously declined to strike testimony of the State's expert witness. Lilly further contends that he was denied a fair trial due to testimony that he identified as a gang member, notwithstanding the fact that the trial court granted to Lilly all relief sought to correct the purported error. We conclude that these assertions of error are without merit and affirm Lilly's convictions.

Lilly additionally asserts, and the State concedes, that the trial court imposed a condition of community custody without making the requisite findings to authorize the imposition of that condition. We accept the State's concession. Accordingly, we remand this matter to the trial court to consider whether, based

on the record presented, the requisite findings to support the condition can be made.

I

Marvin Lilly is the step-grandson of Ronald Coleman, who married Lilly's maternal grandmother in 2002. When Lilly was a child, he lived with his grandmother and Coleman "on and off" when his mother traveled for work. Coleman attended Lilly's basketball games and tried to act as a mentor to keep Lilly "on the right path." At he got older, Lilly continued to live with his grandmother and Coleman for periods of time when there were disagreements in his mother's home. Coleman continued to try to mentor Lilly.

Around 2016, Lilly went to North Carolina to visit his father. He returned to Washington in early 2019 after losing his job. Lilly was living out of his car. When he asked his grandmother and Coleman if he could live with them, they agreed. Coleman helped Lilly get a job, and he drove Lilly to and from work. Coleman had "mentor talks" with Lilly "[c]onstantly" during that time.

Lilly, however, felt resentful of Coleman, whom he described as having a "power trip" and acting like a "drill sergeant." Lilly blamed Coleman for his parents' separation. He reported beliefs that Coleman was a threat to him and to his family, including that Coleman might have "homosexual designs" toward him. Not long after Lilly returned to Washington, he witnessed an incident between his younger brother and Coleman, which he interpreted as threatening to his brother's life.

After Lilly returned from North Carolina, Coleman noticed "a certain

change" in him. One night when Coleman was driving Lilly to work, Lilly confronted him "out of the blue." He told Coleman that the way Coleman treated him made Lilly feel "like he was stupid." After their discussion, Lilly moved back into his mother's home.

Coleman did not see Lilly again until May 16, 2019. On that afternoon, Lilly called Coleman and asked if they could meet at Coleman's church, where Coleman served as an armed security guard. Lilly told Coleman that he had something personal to discuss. Coleman agreed to meet with him.

As Coleman was backing into a parking spot at the church, he saw Lilly approaching his car. Lilly began "grabbing at [the] car door" and looked "really anxious." When Coleman unlocked the car door, Lilly stuck his upper body into the car and pulled a gun out of his pocket. He pointed the gun at Coleman and pulled the trigger, but the gun did not fire. Lilly then "got to jiggering with" the gun. He tried to manipulate the slide of the gun and again pointed the gun at Coleman and attempted to fire it. It did not fire. Lilly tried to manipulate the gun multiple times.

Coleman then jumped out of the car and pulled out his own gun. Lilly continued to manipulate his gun, it appearing to Coleman as if Lilly was attempting "to get a round chambered." Lilly then retreated behind a metal electrical box in the church parking lot. Coleman ordered Lilly to drop his gun. When Lilly did not comply, Coleman fired a round at the electrical box. Lilly then flung his gun away and laid down in a prone position on the ground, where he remained until police arrived.

3

The police officers who responded to the scene discovered a box of Hornady nine-millimeter ammunition in Lilly's pocket. They located live ammunition near the front passenger door of Coleman's car, which was still open. In addition, officers located live rounds of ammunition to the left of the electrical box that were the same brand as those found in Lilly's pocket. The magazine of the gun recovered by police contained live rounds, and there was a round in the chamber of the gun.

Lilly was charged with assault in the second degree with a firearm enhancement, unlawful possession of a firearm in the first degree, and attempted murder in the first degree. The case proceeded to a jury trial.

At trial, Richard Wyant, a forensic scientist with the Washington State Patrol Crime Lab, testified that he had examined the gun that police had recovered from the scene. He discovered that "the firing pin was broken." After Wyant replaced the firing pin, the gun operated correctly. Wyant testified that broken firing pins in that type of gun are "very common." A firing pin costs about "$5.00," he explained, and could be replaced easily within a minute or two. Other than the broken firing pin, Wyant testified, the gun was fully operational.

In closing argument, the State argued that the gun allegedly used by Lilly "could easily be made operational and repaired easily." Defense counsel, noting that Wyant has had extensive firearms training, disputed that Lilly could have rendered the gun operational with reasonable effort and in a reasonable time period. In rebuttal, the State again asserted that Lilly could have easily rendered the firearm operational.

4

Before jury deliberations, the trial judge informed the jury that it would "have the exhibits that have been admitted into evidence," but that the court would not "send[] the actual firearm back into the evidence room." Instead, the court advised the jury: "If you believe that you need to see the firearm," the presiding juror "can use the question form" to make such a request, and "we'll facilitate you looking at the firearm."

The trial court instructed the jury regarding the definition of a "firearm":

> A "firearm" is a weapon or device from which a projectile may be fired by an explosive such as gunpowder. A temporarily inoperable firearm that can be rendered operational with reasonable effort and within a reasonable time period is a "firearm." A disassembled firearm that can be rendered operational with reasonable effort and within a reasonable time period is a "firearm."

Jury Instruction 12.

The court further instructed the jurors that, in order to convict Lilly of assault in the second degree, they must find beyond a reasonable doubt that Lilly assaulted Coleman "with a deadly weapon." Jury Instruction 8. The jury was instructed that "[a] firearm, whether loaded or unloaded is a deadly weapon." Jury Instruction 11. In addition, imposition of the firearm enhancement required the jury to find by special verdict that Lilly "was armed with a firearm" when the assault was committed. Jury Instruction 24.

To convict Lilly of unlawful possession of a firearm in the first degree, the jury was required to find beyond a reasonable doubt that Lilly had "knowingly owned a firearm or knowingly had a firearm in his possession or control." Jury Instruction 13.

During its deliberations, the jury submitted the inquiry form to the trial court, stating: "We would like to examine the firearm." When the jury entered the courtroom, the trial judge explained:

> We received your request to examine the firearm, which I believe. . . is Exhibit 69 . . . .
> . . . So, it's here in the courtroom in the plexiglass box. What we're going to do is give you a chance to just come up and look at it. . . . Because this is a tool that has obvious implications, it's a firearm, we're bringing you back in here to look at it.

Defense counsel interposed no objection to the trial judge's use of the term "firearm."

The jury found Lilly guilty of assault in the second degree while armed with a firearm and unlawful possession of a firearm in the first degree. The jury acquitted Lilly on the charge of attempted murder in the first degree. The trial court imposed a total standard range sentence of 77 months of confinement and 18 months of community custody. As a condition of community custody, the trial court ordered Lilly to "obtain a mental health evaluation and follow all treatment recommendations including taking all prescribed medications."

Lilly appeals.

II

Lilly first contends that the trial court impermissibly commented on the evidence by referring to the gun allegedly used to commit the charged crimes as a "firearm." This is so, according to Lilly, because the jury was required to find that the gun met the definition of "firearm" in order to convict him of the charged crimes. We disagree. In stating that the gun was "a firearm," the trial court was referring to the gun as presented to the jury at trial—not to the gun in its condition

6

when the alleged crimes were committed. Because the trial court did not convey an opinion regarding whether the gun met the operability definition when the alleged crimes occurred, the court did not comment on the evidence.[1]

Article IV, section 16 of our state's constitution provides: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." The purpose of this prohibition on judicial comments on the evidence "is to prevent the jury from being influenced by knowledge conveyed to it by the court as to the court's opinion of the evidence submitted." State v. Elmore, 139 Wn.2d 250, 275, 985 P.2d 289 (1999). "An impermissible comment on the evidence is an indication to the jury of the judge's personal attitudes toward the merits of the case." State v. Ciskie, 110 Wn.2d 263, 283, 751 P.2d 1165 (1988).

A trial court's statement constitutes a judicial comment on the evidence if the statement "reveal[s] the court's 'attitudes toward the merits of the case' or reflect[s] the court's personal opinion of any disputed issue before it." State v. Bass, 18 Wn. App. 2d 760, 804, 491 P.3d 988 (2021) (quoting State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006)). Article IV, section 16's prohibition on

---

[1] Lilly contends that judicial comments on the evidence are manifest constitutional errors and, thus, that he may raise this unpreserved claim of error for the first time on appeal. The State disagrees, relying on Division Two's decision in State v. Gouley, 19 Wn. App. 2d 185, 197, 494 P.3d 458 (2021), and asserts that we should review the claim of error only if Lilly demonstrates actual prejudice resulting therefrom.

Our Supreme Court, however, has held that judicial comments on the evidence constitute manifest constitutional errors that may be raised for the first time on appeal. State v. Levy, 156 Wn.2d 709, 719-20, 132 P.3d 1076 (2006). We take our Supreme Court at its word and will not assume that the court overruled its precedent sub silentio. See State v. Lupastean, 200 Wn.2d 26, 40, 513 P.3d 781 (2022) ("'Where we have expressed a clear rule of law . . . we will not—and should not—overrule it sub silentio. To do so does an injustice to parties who rely on this court to provide clear rules of law.'" (alteration in original) (quoting Lunsford v. Saberhagen Holdings, Inc., 166 Wn.2d 264, 280, 208 P.3d 1092 (2009))).

such comments "forbids only those words or actions which have the effect of conveying to the jury a personal opinion of the trial judge regarding the credibility, weight or sufficiency of some evidence introduced at the trial." State v. Jacobsen, 78 Wn.2d 491, 495, 477 P.2d 1 (1970). To determine whether a trial court's statement amounts to a comment on the evidence, we "look to the facts and circumstances of the case." Jacobsen, 78 Wn.2d at 495. "The fundamental question underlying our analysis of judicial comments is whether the mere mention of a fact . . . conveys the idea that the fact has been accepted by the court as true." Levy, 156 Wn.2d at 726.

Here, in response to an inquiry submitted by the jury requesting to "examine the firearm," the trial court informed the jury that, given safety concerns, the court would bring the jurors back into the courtroom to do so. The court explained: "Because this is a tool that has obvious implications, it's a firearm, we're bringing you back in here to look at it." Lilly contends that, because the jury was required to find that the gun met the instructional definition of "firearm" when the alleged crimes were committed, the trial court's reference to the gun as a "firearm" was a judicial comment on the evidence. We disagree.

Lilly's contention is premised on a temporal assumption that is unsupported by the record. Specifically, the trial court's reference to the gun as a "firearm" could be a comment on the evidence only if the court were referring to the gun in its condition when the alleged crimes were committed. However, ample evidence was submitted to the jury that the gun was in a different condition during trial than on May 16, 2019. Coleman testified extensively that,

despite Lilly repeatedly pulling the trigger and "jiggering with" the gun, the gun did not fire. Following recovery of the gun from the scene, a firearms expert with the local police department confirmed that the gun, in its condition at that time, was inoperable. The gun was then sent to the Washington State Patrol for further testing. As forensic scientist Wyant testified at trial, the gun's firing pin was broken. After he replaced the firing pin, the gun became fully operable and was able to be fired.

In order to convict Lilly of assault in the second degree while armed with a firearm and unlawful possession of a firearm in the first degree, the jury was, indeed, required to find that the gun was a "firearm." Pursuant to the court's instruction to the jury, a "firearm" includes a "temporarily inoperable firearm that can be rendered operational with reasonable effort and within a reasonable time period." Jury Instruction 12. Lilly is incorrect, however, that the trial court provided an opinion regarding whether the gun—at the time of the events at issue—met this definition. Rather, the trial court's statement was a clear reference to the gun at the time the jury requested to examine it. Given the testimony presented at trial, the jury was well-informed that the gun was in a different condition at trial than on the date of the alleged crimes. "Juries are not leaves swayed by every breath," United States v. Garsson, 291 F. 646, 649 (S.D.N.Y.1923), and we will not second-guess the ability of the jurors here to perform the duty with which they were tasked.

Further evidencing that the jury attached no special significance to the court's use of the term "firearm," defense counsel, the prosecutor, the witnesses,

and even the jury itself frequently employed the term during trial without any objection by defense counsel. Lilly asserts that whether witnesses and attorneys used the term "firearm" is irrelevant, because only comments on the evidence made by the court itself are constitutionally proscribed. However, Lilly misunderstands the materiality of the repeated use of the term throughout trial. The frequent use of the term "firearm" indicates that attorneys, witnesses, and—most importantly—the jury did not infer that its use demonstrated that the gun met the operability definition applicable in this case. Rather, the participants at trial understood that references to the "firearm" were meaningful only within the context of the evidence presented.[2]

The contested fact at trial, which the jury was tasked to resolve, was whether the "temporarily inoperable firearm" used by Lilly on May 16, 2019 could "be rendered operational with reasonable effort and within a reasonable time period." Jury Instruction 12. Within the context of the evidence presented to the jury, the trial court's use of the term "firearm" did not convey an opinion regarding whether the gun could have been made operational on the date of the alleged crimes or that the court had accepted any such fact as true. Rather, that factual issue was properly determined by the jury itself, without exposure to any indication of the court's attitude regarding the merits of the case.

---

[2] Lilly also asserts that the trial court's statement conveyed to the jury that the gun was dangerous and, therefore, operable. According to Lilly, the statement that the gun "is a tool that has obvious implications, it's a firearm," indicates "that the device was in fact operable." Reply Br. of Appellant at 13. Maybe so. But so what? The trial court's statement regarding the dangerous nature of the gun at trial conveyed an opinion regarding only the gun's operability at the time of deliberations. It did not convey the trial court's opinion regarding whether the gun could have been made operable on the date of the alleged crimes, which was the disputed fact that the jury was tasked to resolve.

The record demonstrates that the trial court, in referring to the gun as a "firearm," was referencing the gun in its condition at trial. Accordingly, the court's statement was not a comment on the evidence.

III

Lilly additionally contends that the trial court abused its discretion by declining to strike the testimony of forensic psychologist Jolene Simpson, Ph.D., that she had diagnosed Lilly with cannabis use disorder. We disagree. Dr. Simpson's testimony was relevant to establishing that she had engaged in the "two-step process" of performing a forensic evaluation and, thus, had thoroughly and competently performed that evaluation. The trial court did not abuse its discretion in determining that Dr. Simpson's brief mention of the diagnosis was both relevant and not unfairly prejudicial.

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. State v. Ortuno-Perez, 196 Wn. App. 771, 783, 385 P.3d 218 (2016). "Abuse exists when the trial court's exercise of discretion is 'manifestly unreasonable or based upon untenable grounds or reasons.'" State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002) (quoting State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). In other words, "[a] trial court abuses its discretion if 'no reasonable person would take the view adopted by the trial court.'" State v. Jennings, 199 Wn.2d 53, 59, 502 P.3d 1255 (2022) (internal quotation marks omitted) (quoting State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)).

Evidence is relevant if it has "any tendency to make the existence of any

fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Generally, all relevant evidence is admissible, although evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." ER 402, 403. "The threshold to admit relevant evidence is very low. Even minimally relevant evidence is admissible." Darden, 145 Wn.2d at 621.

Here, Lilly asserted a diminished capacity defense to the charged offenses. In support of this defense, he presented the testimony of psychiatrist Steven Manley Juergens, M.D. Dr. Juergens diagnosed Lilly with delusional disorder, and he opined that Lilly had delusional beliefs about Coleman that impacted his behavior on the day of the alleged crimes.

To rebut Lilly's diminished capacity defense, the State presented the testimony of Dr. Simpson. Dr. Simpson testified that performing a forensic evaluation to assess diminished capacity is a "two-step process." First, the evaluator must determine if the individual has a mental disorder. Second, the evaluator must determine whether that disorder impaired the individual's ability to form the requisite intent to commit the charged crimes. When the State asked Dr. Simpson to convey her findings regarding the first step of the evaluation process, she testified: "[I]n my assessment of Mr. Lilly, the diagnosis that I provided was cannabis use disorder." Regarding the second step of the evaluation process, Dr. Simpson testified that she did not find any impairments in Lilly's capacity to form the requisite intent to commit the charged crimes.

Defense counsel objected to Dr. Simpson's testimony that she had

diagnosed Lilly as a person with cannabis use disorder. Out of the presence of the jury, the trial judge and counsel engaged in a lengthy discussion regarding pretrial rulings and the admissibility of Dr. Simpson's testimony. Following this discussion, the trial court ruled that the diagnosis testimony was relevant to show that Dr. Simpson's evaluation was thorough and complete. The trial court additionally ruled that the testimony was not unfairly prejudicial. The court determined, however, that any additional testimony regarding cannabis use would not be relevant and, thus, prohibited the State from eliciting further testimony on the issue. Dr. Simpson did not further testify regarding the diagnosis.

Lilly first asserts that Dr. Simpson's brief testimony regarding the diagnosis was inadmissible because it was not relevant to his diminished capacity defense. This is so, he contends, because Dr. Simpson opined that cannabis use disorder did not affect Lilly's ability to form the requisite mental state to commit the charged crimes. We disagree. The relevance of Dr. Simpson's testimony is not to demonstrate whether Lilly could form the requisite intent to commit the charged crimes, but to show that Dr. Simpson's evaluation of Lilly was as complete and competent as that made by Dr. Juergens.

As Dr. Simpson explained, performing a forensic mental evaluation is a "two-step process" involving the identification of a mental disorder, if any, and then evaluating the disorder's impact on the ability to form intent. Thus, whether Dr. Simpson made a diagnosis in the first step of that process is necessarily pertinent to her subsequent assessment of whether any diagnosis impacted

Lilly's ability to form the requisite intent to commit the charged offenses. As the trial court ruled, the cannabis use diagnosis was relevant to demonstrate that Dr. Simpson, like defense expert Dr. Juergens, had performed a thorough and competent evaluation of Lilly's mental capacity.

Lilly additionally contends that the trial court abused its discretion in concluding that Dr. Simpson's testimony regarding cannabis use disorder was not unfairly prejudicial. However, Lilly cites to no decisional authority holding that a sole mention of cannabis use disorder constitutes unfair prejudice. Moreover, to exclude this testimony on the basis of ER 403, its probative value must be "substantially outweighed" by the danger of unfair prejudice. Given the limited nature of Dr. Simpson's testimony regarding cannabis use disorder, coupled with Washington's legalization of private marijuana possession, the danger of unfair prejudice in this circumstance appears minimal. The trial court did not abuse its discretion in ruling that the single mention of this disorder was admissible.

The relevance and admissibility of evidence is the purview of the trial court, and we will reverse an evidentiary ruling only when no reasonable person would have so ruled. Jennings, 199 Wn.2d at 59. The trial court did not err by determining that Dr. Simpson's testimony was both relevant and not unfairly prejudicial.

IV

Lilly next asserts that Coleman's testimony in violation of a ruling in limine constitutes an irregularity requiring reversal of his convictions. Again, we disagree. Defense counsel's objection to the testimony was sustained, the

14

motion to strike the testimony was granted, and the trial court instructed the jury to disregard Coleman's remark. Defense counsel requested no further relief. Accordingly, there was no error.

"An irregularity in trial proceedings is grounds for reversal when it is so prejudicial that it deprives the defendant of a fair trial." State v. Condon, 72 Wn. App. 638, 647, 865 P.2d 521 (1993). When a defendant seeks a mistrial due to testimony contravening an exclusionary ruling, and the trial court denies the defendant's motion, we must determine whether the prejudice resulting from the offending testimony was sufficient to warrant a mistrial. State v. Christian, 18 Wn. App. 2d 185, 199, 489 P.3d 657 (2021). However, when a defendant receives all relief sought, and no further remedy is requested, any claim that the trial judge should have imposed a further remedy is forfeited. State v. Giles, 196 Wn. App. 745, 769, 385 P.3d 204 (2016) (when a defendant receives the remedies he requests, "[t]he law presumes that these remedies are effective").

Before trial, Lilly moved for permission to cover his visible tattoos with makeup to prevent the jury from speculating about gang affiliation. The State did not oppose this request, but explained that evidence of Lilly's gang involvement was relevant to the case. Specifically, the State's theory was that Lilly's membership in a gang resulted in conflict between Lilly and Coleman, leading to the resentment and anger that motivated Lilly to commit the charged offenses. Thus, the State sought to present evidence of an incident in which Lilly confronted Coleman "about how he's treated, and – and since he's known that he was in a gang, and how he doesn't like how he makes him feel like he's stupid."

15

The trial court granted Lilly's motion to exclude evidence regarding this discussion of gang affiliation between Coleman and Lilly in the State's case in chief.

During direct examination, Coleman testified regarding his relationship with Lilly. He stated that, in the weeks preceding the alleged crimes, he noted a "certain change" in Lilly. Coleman testified:

> [O]ne night I was taking him to work, and we were talking like we normally do. And then all of a sudden, he just came out of the blue and says, "You know, you think I'm a gang-banger. You know, you think I'm stupid, you know . . . because I'm in a gang?"

Defense counsel immediately objected and moved to strike Coleman's testimony. The trial court sustained the objection and granted the motion to strike. The court instructed the jury to "disregard the previous two answers given by the witness." There was no further testimony regarding gang involvement. Lilly sought no further remedy.

Our decision in Giles is controlling. In Giles, as here, the defendant asserted that a witness's testimony in violation of a ruling in limine deprived him of his right to a fair trial, notwithstanding the fact that the trial court "struck the offending testimony and issued a curative instruction" and defense counsel "requested no other remedy." 196 Wn. App. at 765. On appeal, Giles asserted that the purported error required a new trial. Giles, 196 Wn. App. at 765. However, "Giles' argument is—at its core—that the trial court erred by not declaring a mistrial, even though Giles did not request a mistrial." Giles, 196 Wn. App. at 769.

We recognized that "[t]o accede to Giles' appellate request [for a new

16

trial] would be to put trial judges in untenable positions." Giles, 196 Wn. App. at 770. "Had the trial judge declared a mistrial without Giles' assent, the double jeopardy bar might well have prevented his retrial." Giles, 196 Wn. App. at 769. "[F]or this and other reasons," we held, "a mistrial should be granted only when nothing that the trial court could have said or done would have remedied the harm done by the trial misconduct." Giles, 196 Wn. App. at 769. We concluded that, by striking the offending testimony and instructing the jury to disregard that testimony, the trial court had "imposed [the] appropriate remedial measures." Giles, 196 Wn. App. at 769.

Indeed,

> [i]t is a principle of long standing that a trial attorney who does not request a remedy forfeits the claim that the trial judge should have imposed that remedy. "'Counsel may not remain silent, speculating upon a favorable verdict, and then, when it is adverse, use the claimed misconduct as a life preserver on a motion for a new trial or on appeal.'" State v. Russell, 125 Wn.2d 24, 93, 882 P.2d 747 (1994) (quoting Jones v. Hogan, 56 Wn.2d 23, 27, 351 P.2d 153 (1960)).

Giles, 196 Wn. App. at 769-70.

Here, defense counsel objected to Coleman's testimony implying that Lilly identified as a gang member and moved to strike the testimony. The trial court sustained the objection and granted the motion to strike. The court immediately instructed the jury to disregard the offending testimony. Significantly, Lilly sought no further remedy. The law presumes that the remedies granted by the trial court were effective. Giles, 196 Wn. App. at 769. The court did not err by granting Lilly the relief that he sought. See Giles, 196 Wn. App. at 765.

Lilly was not denied a fair trial when the trial court granted all requested

17

relief in response to testimony that contravened the court's exclusionary ruling.[3]

We conclude that, in declining to sua sponte declare a mistrial, the trial court did not err.[4]

V

Lilly additionally contends that the trial court lacked the authority to impose a mental health community custody condition and, thus, that the condition must be stricken from the judgment and sentence. The State concedes that the trial court did not make the requisite statutory findings to impose the condition, but asserts that the appropriate remedy is to remand to the trial court for a determination of whether the record supports such findings. We accept the State's concession and agree that remand is appropriate.

A trial court may order a mental health evaluation and participation in mental health treatment as a condition of community custody only "if the court finds that reasonable grounds exist to believe that the offender is a mentally ill person as defined in RCW 71.24.025, and that this condition is likely to have influenced the offense." RCW 9.94B.080. See also State v. Shelton, 194 Wn.

---

[3] State v. Escalona, 49 Wn. App. 251, 742 P.2d 190 (1987), cited by Lilly in asserting that a trial irregularity may require a new trial, is inapposite. There, the defendant moved for a mistrial, and the trial court denied the defendant's motion. Escalona, 49 Wn. App. at 253. Accordingly, the question on appeal was whether the trial court had abused its discretion in denying the motion for a mistrial. Escalona, 49 Wn. App. at 254-55. See also Christian, 18 Wn. App. 2d at 198-200; Condon, 72 Wn. App. at 647-50. Neither a request for a mistrial nor denial of such a request occurred here.

[4] Lilly additionally contends that he was denied the right to a fair trial due to cumulative error. "Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." State v. Emery, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). However, here, Lilly's claims of error, including that the trial court impermissibly commented on the evidence, abused its discretion in allowing testimony regarding Dr. Simpson's diagnosis, and denied him a fair trial due to gang-related testimony, are unmeritorious. Finding no error in the judgment on the jury's verdicts, we also conclude that Lilly was not denied a fair trial due to cumulative error.

App. 660, 675-76, 378 P.3d 230 (2016).  When the trial court has not made the requisite findings to order such a community custody condition, we have "remand[ed] to determine whether to order a mental health evaluation according to the requirements set forth in former RCW 9.94B.080 [2008]."  Shelton, 194 Wn. App. at 676.

Here, public safety and Lilly's own well-being may be served by a mental health evaluation and treatment.  Moreover, the imposition of the community custody condition is rehabilitative and does not increase the punitive aspect of the sentence.  Thus, we remand to the trial court to consider, based on the record presented, whether the requisite statutory findings can be made to support the imposition of the condition or whether that condition must be eliminated from the sentence.

We affirm Lilly's convictions.  We remand to the trial court to consider whether the record supports imposition of the challenged community custody condition.

Affirmed in part, reversed in part, and remanded.

Duyn, J.

WE CONCUR:

Chung, J.          Mann, J.

19